No. 27          September 26, 2016          263

## IN THE OREGON TAX COURT
## REGULAR DIVISION

SENECA SUSTAINABLE ENERGY, LLC,
*Plaintiff,*

*v.*

DEPARTMENT OF REVENUE,
*and*

LANE COUNTY,
*Defendants.*

(TC 5193, 5208)

Plaintiff (taxpayer) appealed from a decision of the Magistrate Division regarding real market value of its real property, a biomass electricity cogeneration facility located next to a saw mill in Lane County. The department erroneously included intangible value into its assessment relating to the favorable terms of a power sales agreement (PSA) previously entered into by taxpayer when the market was more favorable. The evidence showed that the terms of the PSA were more favorable than what a typical purchaser of a property might expect in the marketplace. In addition, at trial, the appraiser for the department admitted that he had no financial or appraisal authority for the approach he used in developing a capitalization rate, while taxpayer presented testimony of an expert who testified as to both the accepted financial and appraisal methods of developing a capitalization rate. That method looks to the risks and rewards of the property being valued and not the cost of capital to the purchaser. In its post-trial brief, the department provided the court with an excerpt from the text relied upon by the financial analysis expert for taxpayer, apparently believing it rebutted the testimony of that expert. However, the excerpt provided contained exactly the analysis set forth regarding both the error in looking to the cost of capital of a purchaser and the necessity of looking at the risks and rewards of the subject property to the hypothetical purchaser. The appraiser for the department thus adopted a fundamentally incorrect approach to determination of a capitalization rate. That action and the inclusion of intangible value relating to the PSA rendered his conclusions completely without persuasive value. While the determination of a capitalization rate by taxpayer's appraiser was not entirely free of weaknesses, it was by far the most persuasive determination as to capitalization rate.

Trial was held April 6 through 15, 2015, in the courtroom of the Oregon Tax Court, Salem.

David L. Canary and Cynthia M. Fraser, Garvey Schubert Barer PC, Portland, argued the cause for Plaintiff (taxpayer).

Marilyn J. Harbur, Senior Assistant Attorney General, Department of Justice, Salem, argued the cause for Defendant Department of Revenue (the department).

Decision rendered September 26, 2016.

**HENRY C. BREITHAUPT, Judge.**

## I.   INTRODUCTION

This case is before the court after a trial to determine the real market value (RMV) of property owned by Plaintiff (taxpayer). In a prior order, this court determined that valuation should be resolved even though the property is currently not subject to tax by reason of being in an economic development zone. *See Seneca Sustainable Energy v. Lane County Assessor*, 21 OTR 366 (2014).

The tax years at issue are 2012-13 and 2013-14 and the corresponding assessment dates are January 1, 2012, and January 1, 2013. The property at issue was noted on the assessment roll for the 2012-13 tax year as required under ORS 285C.175(7)(a).[1] That notation requires a determination, in accordance with Article XI, section 11, of the Oregon Constitution (Measure 50), of the assessed value (AV) of the property as if it were not exempt. The AV is determined by reference to the RMV of the property and the maximum assessed value (MAV) of the property.[2]

Defendant Department of Revenue (the department) presented testimony as to the value of the property as of January 1, 2012, but did not present an appraisal as of January 1, 2013. The department attempted to introduce evidence of RMV as of January 1, 2013, based on trending of values from and after January 1, 2012. Taxpayer moved to exclude such evidence on the basis that the documentary support for such testimony had not been exchanged with taxpayer pursuant to the requirements of Tax Court Rule (TCR) 56. The court granted taxpayer's motion.

---

[1] The court's references to the Oregon Revised Statutes (ORS) are to 2011.

[2] A full discussion of how the AV is affected by the RMV is not within the scope of this decision. It is enough to say that the AV of a property is equal to the lesser of that property's RMV or its MAV. ORS 308.146. Accordingly, at the very least, to the extent that the RMV is below the MAV, the AV is dependent upon the RMV. For a fuller discussion and examples of the operations of RMV, MAV, and AV, see the Appendix to and text in Section II of *Comcast Corp. III v. Dept. of Rev.*, 22 OTR 233, 234-38, 260-63 (2016).

Following trial in this case and submission of post-trial briefs, the department requested leave to file a sur-reply. That request is denied.

## II.   FACTS

The court finds the following facts, some of which are not in dispute. For the reasons discussed in the Analysis portion of this Opinion, the court bases its ultimate conclusions as to RMV primarily on the income indicator of value and places essentially no weight on the cost indicator of value. Therefore the relevant facts will relate to the income indicator of value. Certain factual conclusions are also found in the Analysis section of this Opinion. *See* 22 OTR at 268-73.

The property in question is a biomass cogeneration facility located next to a saw mill owned and operated by an affiliate of taxpayer. The location is within an area with significant air quality issues and taxpayer was required to install several items of equipment to minimize or reduce pollution.

The property also includes a drying kiln owned by taxpayer and included in the account under appeal for the 2012-13 year. The kiln is leased by taxpayer to the saw mill affiliate. The record indicates that the kiln was built at a cost of approximately $2,236,000. The lease in effect as of the assessment dates had a term of seven years and a monthly rent of $25,000. Testimony of taxpayer indicates that these terms were intended to be, in effect, a capital lease for seven years. At the expiration of that term it was anticipated that the lease would be renewed at a much lower, but market-rate, rental.

Taxpayer obtains woody biomass fuel that is waste product from the affiliated saw mill, as well as slash and waste from the logging operations of affiliates, and potentially from other parties. The evidence indicates these acquisitions are at market prices. It is important, however, to note that the delivery of fuel is not guaranteed to taxpayer. If the wood products industry declines, fewer trees will be cut, less slash will be created in logging operations, and less waste at the affiliated saw mill will be produced. Therefore, fuel availability for a woody biomass facility like that in this case, contains a risk element.

In the operation of the biomass facility, wood waste is burned for the production of steam. A portion of the steam is sold to taxpayer's affiliate for use in the kiln to dry lumber. The rest of the steam is used to drive a turbine and generate electricity. That electricity is sold by taxpayer to the Eugene Water and Electric Board (EWEB) under a long-term power sales agreement (PSA). The PSA was negotiated in the period of 2009 and 2010. The existence of the PSA made possible debt financing of a portion of the cost of the property. Equity capital was also invested in the project.

A significant factual question is whether, as of the relevant assessment dates, a purchaser of the property could have sold the electric output of the biomass facility at the rates found in the PSA or at rates above or below the PSA rates. There is also an important question of fact as to what price levels would exist in the future. On these questions of fact, the evidence presented by taxpayer far outweighs in persuasiveness that presented by the department. Taxpayer's witnesses William Carlson and James Harlan have had, and continue to have, significant experience in, and knowledge of, the operations of the power markets in the Pacific Northwest, including especially the markets for power generated by biomass cogeneration facilities. The expert witness for the department was simply not as familiar with the energy market in the Northwest and was not as persuasive as the witnesses for taxpayer.

The court accepts the evidence provided by taxpayer's witnesses as to the terms on which a purchaser of the property could have sold the output of the property as of the assessment dates and in the future. That evidence indicates that, as of the assessment dates, the PSA brought to taxpayer revenues significantly in excess of what a purchaser of the property on those dates would have been able to negotiate for, either in the spot market or pursuant to a contract entered into as of the assessment dates. In addition, the fact that taxpayer had any contract pursuant to which its output could be sold had some value. This is especially true given taxpayer's evidence that contracts for any significant future sales may not have been available as of the assessment dates. The court also concludes that taxpayer has carried its burden of proof whether possible revenues

are determined only as of the assessment dates or over the future of the operation of the property.

Revenues from the sale of electricity generated at a biomass cogeneration facility can be some combination of payments for energy, payments for capacity, and revenue from the sale of Renewable Energy Credits (RECs). A biomass facility is a qualified facility under federal law and can require utilities to purchase electricity from it at the marginal avoided cost of the purchaser from a new alternative plant. For the assessment dates in question, the marginal avoided cost was determined by facilities using natural gas as a fuel. Prices of natural gas had, as of those dates, fallen precipitously from the levels at which they were when the process of planning for and construction of taxpayer's property began. Accordingly, the price at which utilities had to purchase energy from this facility would also have experienced a steep decline. That decline was present as of January 1, 2012, and continued to accelerate through January 1, 2013. Taxpayer's evidence fully supports that conclusion.

A purchaser may pay for capacity if the purchaser needs assurance that the seller will deliver certain quantities of energy at certain peak need times. In the Northwest, it is unusual for utilities buying from cogeneration plants to pay for capacity. The reason for this is the presence in the Northwest market of the Bonneville Power Administration and its constant production of hydroelectric energy available to any person needing capacity. Although the PSA had substantial payments for capacity, those payments are a feature of the particular contract that taxpayer was able to negotiate. The facts and testimony indicate such payments would not have been available to a purchaser of the biomass facility on the assessment dates.

A third source of revenue from a power sales agreement can come from the sale of RECs. State legislatures in Oregon, Washington, California, and other states have established Renewable Portfolio Standards (RPS) for utilities operating in their respective jurisdictions. These standards have the effect of requiring utilities to have a portion of their sales come from renewable energy sources.

Renewable sources include wind, wave, small hydroelectric, and biomass. A utility can satisfy RPS requirements in one of two ways. First, it can purchase energy produced by a renewable generator such as taxpayer. Second, it can purchase an REC. The utility can then "spend" the REC in the future and at that point it is considered to have acquired a portion of its energy from renewable resources. Purchased RECs can be carried forward into future years for use by a utility.

An REC is produced when a renewable energy generator actually produces energy. However, the generator can sell the REC separately from the energy produced. The revenue from the sale of RECs is one form of incentive created by states and the federal government for production of renewable energy. The revenue from sales of RECs will depend upon the supply of RECs at any point in time and the demand for those RECs. For the years at issue, there was very little, if any, revenue available for the biomass facility in question from the sale of RECs. This was due primarily to a decreased demand. That decreased demand was a product of two factors. First, some utility customers in Oregon had already purchased RECs for future use sufficient to cover their needs. Second, the California market had been effectively closed to Oregon renewable generators by a requirement that RECs used in California had to arise from energy produced in California. Accordingly, as of the assessment dates in question here, little if any revenue would have been available to a purchaser of taxpayer's biomass facility.

## III.  ISSUE

The issue for decision is the RMV of the property as of the assessment dates.

## IV.  ANALYSIS

Neither appraiser presented information on a comparable sales indicator of value. Each appraiser presented a cost indicator and an income indicator. The court has reviewed and considered both the testimony and the appraisal reports with respect to the cost indicator of value. Given the findings of the court regarding the prices for the output of the property that a purchaser of the property

would have been able to achieve as of the assessment dates, the property suffered from significant economic or external obsolescence as of each of those assessment dates.

The appraiser for the department concluded that no such economic obsolescence existed as of the assessment dates. That conclusion was erroneous given the facts found above, especially those facts related to the presence of cheap natural gas fired plants that would set the marginal avoided cost terms for sale of electricity from the subject property. Even as to potential value attributable to RECs, the department's appraiser failed to take into account the significant external effect of changes in the dominant California market for RECs. These deficiencies make the cost indicator developed by the witness for the department unreliable and without persuasive value.

The court is of the opinion that the testimony of witnesses William Carlson and James Harlan strongly support a conclusion that the income indicator is more reliable as an indicator of value. That testimony indicates that future expected income from operations is, in fact, the basis on which market participants would make decisions as to the pricing of any purchases.[3] While the cost indicator developed by the appraiser for taxpayer can serve as something of a check on the reasonableness of the value determined on the basis of the income indicator, the court places no other reliance on the cost indicator.

As to the income indicator developed by the appraiser for the department, there are two extremely significant errors in the work of that appraiser. The quality and quantity of these errors renders the conclusions of that appraiser completely without persuasive value.

The first of the errors in the work of the department's appraiser is his conclusion that a purchaser of the property as of the assessment dates would have been able to

---

[3] The department also errs in viewing the issue in this case as involving a decision by a market participant to construct a facility similar to the subject facility. RMV is defined in terms of value in exchange—that is the value set in a sale transaction. The focus is on what transaction prices would have been on the assessment dates. It is not on what viewpoints or conclusions hypothetical purchasers or constructors would have had at the earlier point in time when taxpayer made a decision to construct the subject property.

sell energy, capacity, and RECs at the same rates as those found in the PSA. As indicated in the factual findings of the court, such rates would not have been available as of the assessment date or in the future. The evidence as to the collapse in natural gas prices and the corresponding collapse in the rates available to qualified facilities for energy sales compels a conclusion at odds with that of the department's appraiser. The same is true as to any payments by a utility for capacity or RECs.

The fact is that taxpayer was extremely fortunate to have negotiated for and received contract rights to sell energy, capacity, and RECs at the prices and other terms, including escalation rates over the life of the PSA, found in the PSA. As of the assessment dates, the PSA, an intangible, produced premium returns to taxpayer. However, intangibles held by entities such as taxpayer, entities that are not subject to central assessment under ORS 308.505 to 308.665, are not subject to tax. ORS 307.030. To the extent that any such intangible produces returns in excess of those obtainable in the market for electricity, capacity, and RECs as of the assessment dates, any value attributable to that premium cannot be taken into account.

Taxpayer's appraiser approached these facts and problems the correct way. His income projections were based on evidence of the rates that would have been available to a purchaser of the property, without regard to any premium rates or other terms attributable to the PSA. Taxpayer's appraiser's use of rates for electricity in the market as of the assessment dates has the proper effect of placing no value on the contract.[4]

---

[4] The problem of placing value on an asset that is not subject to tax (here the PSA) is similar to, but factually different from, the more-often discussed problem of valuing income-producing real estate by reference to existing leases rather than leases at rental rates prevailing in the market as of the assessment date. *See Swan Lake Mldg. Co. v. Dept. of Rev.*, 257 Or 622, 478 P2d 393 (1971). The department correctly observes that this case does not involve premium leases as did the *Swan Lake* analysis. However, a problem parallel to that addressed in *Swan Lake* exists when there is a need to exclude from valuation and assessment any value attributable to an intangible contract right. By taking into account only rates available on the assessment date for electricity, an appraiser will exclude any effect of premium, or discount, rates and whatever value or drag on value is produced by the existence of the contract itself.

While there may be some weaknesses with the approach of this appraiser, those weaknesses pale in comparison to the fundamental error of the appraiser for the department. The appraiser for the department admitted in testimony that he valued the entire property and business of taxpayer, subtracting only an amount of working capital. That approach is contrary to Oregon law as it has the effect of making intangible assets subject to assessment in contravention of ORS 307.030. *See* ORS 307.020(1)(a) (defining intangible personal property); *Deschutes County Assessor v. Broken Top Club, LLC*, 15 OTR 231, 236-37 (2000) (citing *Boise Cascade Corp. v. Dept. of Rev.*, 12 OTR 263 (1992)) (good will and going concern value is not taxable in Oregon). The court accepts as most persuasive the conclusions of taxpayer's appraiser as to the income stream to be capitalized.

There is no doubt that a person viewing the hypothetical purchase of the facility on the two assessment dates might object that the purchaser would also buy the rights to the PSA and pay for them, including a premium for the locked-in rates that the PSA contained. That is true as a matter of typical economic behavior. It is not, however, consistent with the law of Oregon. That law demands two things. First, any premium or discount associated with the PSA must be ignored. Secondly, the property must be valued as of the hypothetical sale date, the assessment date, and not the date in the past on which taxpayer was able to secure favorable rates under the PSA.

The appraiser for the department also departed from accepted financial and appraisal principles in determining the capitalization rate to be used in the income indicator of value for the subject property. In developing that capitalization rate, both appraisers used the Weighted Average Cost of Capital method, while employing the Capital Asset Pricing Model to determine the cost of equity capital. However, in his work on this feature of the income indicator, the appraiser for the department looked to the interest rates on debt and equity return rates that potential purchasers had as costs for raising money. The appraiser did not address the debt and equity returns that potential purchasers would expect to receive in connection with an investment through purchase of the subject property. In

taking this approach, the appraiser essentially answered the question of what returns investors would demand in connection with a purchase of the debt or equity of an identified company that the appraiser thought would be a likely purchaser of the subject property.

This approach has at least two major faults. First, it requires an appraiser to identify a particular purchaser for the subject property. Appraisal theory does not support the identification of a particular potential purchaser, or even group of purchasers so as to take into account their particular features. Second, appraisal theory requires a focus on the risks and rewards inherent in the subject property. The approach employed by the appraiser for the department instead looks at how equity and debt market purchasers evaluate the risks and rewards of the entire collection of properties owned by the company that the appraiser has concluded is a likely purchaser of the subject property. In addition, those equity and debt rates reflect the risks and rewards perceived by the market not only for the basket of assets of the identified purchaser, but also the skill of the incumbent management of that company. Appraisal theory requires that an appraiser ignore the skill of any particular potential owner or purchaser and focus instead on typical management skill.

The appraiser for the department admitted that he had no financial or appraisal authority for the approach he used in developing a capitalization rate. Taxpayer, on the other hand, presented expert testimony of Dr. Hal E. Heaton. He testified as to both the accepted financial and appraisal methods of developing a capitalization rate. As indicated above, that method looks to the risks and rewards of the property being valued and not the cost of capital to the purchaser. Importantly, in its post-trial brief, the department provided the court with an excerpt from the text relied upon by the financial analysis expert for taxpayer, apparently believing it somehow rebutted the testimony of that expert. However, the excerpt provided by the department contains exactly the analysis set forth above regarding both the error in looking to the cost of capital of a purchaser and the necessity of looking at the risks and rewards of the subject property to the hypothetical purchaser.

The appraiser for the department thus adopted a fundamentally incorrect approach to determination of a capitalization rate. That action renders his conclusions completely without persuasive value. Again, while the determination of a capitalization rate by the appraiser for taxpayer may not be entirely free of some weaknesses, it is by far the most persuasive determination as to capitalization rate.

Accordingly, the value arrived at by taxpayer's appraiser through use of the income indicator is, by far, the most persuasive of the two appraisals presented to the court. The conclusion reached by taxpayer's appraiser as to the income indicator is found by the court to be, more probably than not, the proper conclusion of value for each of the valuation dates.

## V.   CONCLUSION

The appraiser for taxpayer developed cost and income indicators for the years in question as follows:

|                   | January 1, 2012 | January 1, 2013 |
|-------------------|-----------------|-----------------|
| Cost Indicator:   | $32,500,000     | $17,800,000     |
| Income Indicator: | $38,200,000     | $19,100,000     |
| Reconciled to:    | $34,900,000     | $18,200,000     |

The court finds that the RMV of the property was $38,200,000 as of January 1, 2012, and $19,100,000 as of January 1, 2013. Now, therefore,

IT IS THE OPINION OF THIS COURT that the RMV of the subject property is as listed above.