No. 41          August 2, 2017          423

IN THE OREGON TAX COURT
REGULAR DIVISION

POWELL STREET I LLC,
*Plaintiff,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant*,
*and*

MULTNOMAH COUNTY ASSESSOR,
*Defendant-Intervenor.*

(TC 5263)

Plaintiff (taxpayer) appealed as to real market value (RMV) of its real property in Multnomah County. The subject property (a shopping center) lacked an anchor tenant and was 51 percent vacant on the assessment date. Using the sales comparison approach, the appraisers significantly diverged on whether a comparable property should have a vacant anchor tenant. Taxpayer argued that no market participant would pay the "stabilized" value determined by the income approach for a shopping center that was more than 50 percent vacant. Therefore, according to taxpayer, the subject property's value for tax purposes could not be the stabilized value of the property. The department argued that, notwithstanding the substantial vacancy caused by the vacant anchor space, the subject property was behaving in a stabilized fashion because the anchor space had only recently become vacant after an extended period of occupancy. Given the significant vacancy of the property, the lack of an anchor tenant, the costs and processes associated with attracting and retaining a new anchor tenant, and the lack of a signed lease signifying the retention of a new anchor tenant, the court found that the RMV of the subject property was significantly impaired and that taxpayer's appraiser had appropriately considered comparable sales with significant vacancy issues for the sales comparison approach and adjusted the stabilized RMV determined by the income approach to determine the actual RMV of the subject property. Accordingly, the department's sales comparison analysis was rejected and, to the extent that it did not make a deduction for the substantial vacancy of the subject property, the department's income approach analysis was also rejected.

Trial was held April 18 and 19, 2016, in the courtroom of the Oregon Tax Court, Salem.

Sam Zeigler, Christopher K. Robinson PC, Lake Oswego, argued the cause for Plaintiff (taxpayer).

Joseph A. Laronge and Daniel Paul, Assistant Attorneys General, Department of Justice, Salem, argued the cause for Defendant Department of Revenue (the department).

Carlos A. Rasch, Assistant Multnomah County Counsel, Portland, appeared for Defendant-Intervenor Multnomah County Assessor (the county).

Decision rendered August 2, 2017.

**HENRY C. BREITHAUPT, Judge.**

## I.   INTRODUCTION

This case is before the court after trial to determine the real market value (RMV) of property owned by Plaintiff (taxpayer). The tax year at issue is 2014-15, with a corresponding assessment date of January 1, 2014.

## II.   FACTS

The facts in this case are drawn from the appraisal reports, trial testimony, and exhibits introduced by the parties.

### A.   *The Property*

The property at issue is Powell Street Station (the subject property), an L-shaped shopping center located at the intersection of SE Powell Boulevard and SE 82nd Avenue in Portland, Oregon.[1]

Taxpayer's appraiser considered the quality of the property to be above average, and its condition to be average. The department's appraiser agreed. Taxpayer's appraiser considered the location of the property to be average. The department's appraiser considered the location of the shopping center to be favorable. Both appraisers considered the highest and best use of the property to be continued use as a neighborhood shopping center.

The total area of the shopping center is 393,890 square feet, and includes a building, a supporting parking area, and a small drive-up ATM kiosk. The area of the building is 117,766 square feet, all of which is considered rentable space. That space is broken out into various sizes.

---

[1] Although the shopping center is located at the intersection of SE Powell and SE 82nd, and the shopping center fronts both streets, it does not occupy the actual signalized corner of the intersection.

B.  *The Tenant Spaces*

The largest space, referred to as the anchor space, is 53,720 square feet and was vacant as of the assessment date. Until January 2013, a discount grocer had occupied the anchor space for 25 years. The grocer vacated the anchor space in January 2013, but it continued to pay rent until May 2013. The anchor space represents 45.6 percent of the property's rentable space.

As of the assessment date, taxpayer was in possession of a signed letter of intent with a replacement grocer to operate in the anchor space. The court received testimony on the effect of a letter of intent for tenants of anchor spaces, referred to as anchor tenants. A letter of intent is not contractually binding on either the property owner or the anchor tenant. It was merely evidence of a potential contractual relationship between the two.

The remainder of the rentable space is divided into rentable units of various sizes. Ranging from largest to smallest, the shopping center has one junior anchor space (measuring 21,136 square feet), three large inline spaces (measuring 3,450 to 5,500 square feet), one corner inline space (measuring 4,320 square feet), and sixteen smaller inline spaces (measuring 840 to 2,215 square feet). There was testimony that tenants of these spaces had contractual provisions, typical of the marketplace, which allowed for modifications to the lease in the event the anchor space was vacant. Those modifications include lower rent payments, a hold on rent increases, and cancellation of the lease.

C.  *Tenant Space Vacancy*

In addition to the vacancy of the anchor space, as of the assessment date, taxpayer's appraisal report lists one large inline space (5,400 square feet), the corner inline space (4,320 square feet), and one smaller inline space (1,500 square feet) as vacant, for a combined total of 11,220 square feet or 9.5 percent of the subject property's rentable space. Accordingly, with the addition of the vacant anchor space, 69,940 square feet or 55.1 percent of the property's rentable space was listed as vacant as of the assessment date.

The department's appraiser noted a 49 percent occupancy rate (translating to a 51 percent vacancy rate), but the department does not appear to seize on the difference in vacancy estimates. It appears to the court that the slight difference in the appraiser's actual vacancy rates results from the fact that, contrary to an earlier portion of taxpayer's appraisal report, the vacancy listing on page 54 of the report lists the large inline space as occupied by a tenant. The court determines that the subject property was 51 percent vacant as of the assessment date.[2]

D.  *The Appraisals*

Both parties introduced appraisal reports prepared by their respective appraisers. Although the appraisers came to different value conclusions, much of their analyses are similar. The court will compare and contrast the appraiser's analyses under each appraisal method.

E.  *The Income Approach—Taxpayer*

With respect to the income approach, both parties used the direct capitalization method. Taxpayer's appraiser determined the following market rents: $9.00 per-square-foot for the anchor space; $12.00 per-square-foot for the junior anchor space; $13.00 per-square-foot for the large inline spaces; $10.00 per-square-foot for the corner inline space; and $18.00 per-square-foot for the smaller line spaces.[3] However, because the largest of the large inline spaces, measuring 5,500 square feet, "has a high exposure end cap location at the northeast corner of the property," taxpayer's appraiser determined that a higher market rent, at $18.00 per-square-foot was supported.

Based on these market rents, and an additional $14,400 per year in income from the ATM kiosk, taxpayer's appraiser determined a Potential Gross Income (PGI) of $1,445,082 for the subject property. Taxpayer's appraiser then deducted a ten percent vacancy and credit loss from

---

[2] The effect of this difference on taxpayer's appraisal appears to be negligible.

[3] In determining the market rent for the corner inline space, taxpayer's appraiser treated it as a large inline space for purpose of the rent comparable analysis, but then made a "downward adjustment in excess of 20% for its inferior exposure, access, and overall utility."

the PGI, which gives the subject property an Effective Gross Income (EGI) of $1,300,574. From the EGI, taxpayer's appraiser deducted an estimated eight percent of nonreimbursable expenses to reach a Net Operating Income (NOI) of $1,196,528. Taxpayer's appraiser determined a capitalization rate of eight percent, and, based on the NOI, determined a value of $14,960,000.

Up until this point, although they determined differing market input amounts, both appraisers followed the same appraisal theory. However, taxpayer's appraiser contends that the $14,960,000 value determined under the income approach is the "stabilized value" of the property. As previously discussed, the subject property lacked an anchor tenant and was 51 percent vacant on the assessment date. On this basis, taxpayer made a deduction of $4,710,000 in "lease-up costs" to reflect the loss in rent and costs necessary to attract and retain tenants (particularly an anchor tenant) to reach stabilization. This results in an income approach value determined by taxpayer's appraiser of $10,250,000.

F.    *The Income Approach—The Department*

The department's appraiser also utilized the income approach. The department's appraiser determined the following market rents: $9.00 per-square-foot for the anchor space; $12.00 per-square-foot for the junior anchor space; and $19.00 per-square-foot for the inline spaces. The department's appraiser came to the same market rent conclusion as taxpayer's appraiser as to the anchor and junior anchor spaces. However, the department's appraiser determined a higher overall market rent for the inline spaces and did not differentiate between the sizes of inline spaces or their visibility.

Based on these market rents, and an additional $14,400 per year in income from the ATM kiosk, the department's appraiser determined a PGI of $1,566,802 for the subject property. The department's appraiser then deducted an eight percent vacancy and credit loss from the PGI, which gives the subject property an EGI of $1,441,458. From the EGI, the department's appraiser deducted an estimated ten percent of nonreimbursable expenses to reach a NOI of $1,297,312. The department's appraiser determined

a capitalization rate of 7.50 percent, and, based on the NOI, determined a value of $17,300,000 under the income approach.

G.   *The Sales Comparison Approach*

With respect to the sales comparison approach, the appraisers significantly diverge on whether a comparable property should have a vacant anchor tenant. Taxpayer's appraiser looked for shopping centers around Oregon, including Bend and Klamath Falls, with vacant anchor spaces to determine the impact on value from the substantial vacancy and came to a value conclusion of $10,010,000. Taxpayer's appraiser subsequently adjusted these sales for several factors, including location. The department's appraiser looked for shopping centers in the greater Portland area with occupied anchor spaces and came to a value conclusion of $18,800,000, making no adjustment for the subject property's substantial vacancy.

H.   *The Cost Approach*

With respect to the cost approach, taxpayer's appraiser determined there was a lack of market evidence to establish the depreciation values necessary to determine the replacement cost, and that market participants place little emphasis on the replacement cost of such properties in their value determinations. Accordingly, taxpayer's appraiser did not conduct a cost approach analysis. The department's appraiser did conduct a cost approach analysis, which yielded a value of $19,800,000.

I.   *Reconciliation of Values*

In summary, taxpayer's appraiser determined value indications for the subject property of $10,250,000 under the income approach, and $10,010,000 under the sales comparison approach. Taxpayer's appraiser did not conduct a cost approach analysis. Taxpayer's appraiser gave the sales comparison approach "significant weight," and the income approach "substantial emphasis." Accordingly, taxpayer's appraiser placed equal emphasis on each approach and determined an ultimate value conclusion of $10,130,000 for the subject property.

The department's appraiser determined value indications for the subject property of $17,300,000 under the income approach, $18,800,000 under the sales comparison approach, and $19,800,000 under the cost approach. The department's appraiser placed primary emphasis on the income approach in part because it "is generally considered to be the best and most accurate means of determining the value of income-producing properties." The department's appraiser placed secondary emphasis on the sales comparison and cost approaches. Ultimately, the department's appraiser determined a final value conclusion of $17,500,000 for the subject property.

Additional facts will be introduced as necessary in the analysis section of this Opinion.

### III.   ISSUE

The issue in this case is the RMV of the shopping center as of the assessment date.

### IV.   ANALYSIS

This case concerns the valuation of real property. For purposes of property assessment and taxation, real and personal property is valued at 100 percent of its RMV. ORS 308.232.[4] RMV is defined in Oregon as:

> "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

ORS 308.205(1).

Subject to some limitation, the legislature has determined that RMV "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue." ORS 308.205(2). Neither party relies on the application or interpretation of any rules of the department in this case.

The RMV of property is ultimately a question of fact. *Chart Development Corp. v. Dept. of Rev.*, 16 OTR 9,

---

[4] Unless otherwise indicated, all references to the Oregon Revised Statutes (ORS) are to the 2013 edition.

11 (2001). In addition, methods of accounting or valuation, unless otherwise prescribed by law or regulation, are to be analyzed in light of the evidence introduced by the parties. *Bylund v. Dept. of Rev.*, 292 Or 582, 585, 641 P2d 577 (1982).

Accordingly, subject to the definition of RMV found in ORS 308.205, and any controlling case law or other relevant statutes, the valuation question in this case is one of fact, to be determined in light of the evidence introduced by the parties. In this case, taxpayer has admitted that it has the burden to prove, by a preponderance of the evidence, the RMV of the subject property. ORS 305.427. However, this court also has the authority to determine the RMV of property "without regard to the values pleaded by the parties." ORS 305.412.

There are two main appraisal issues before the court. The first issue is how, if at all, to take into account the substantial vacancy of the subject property. The resolution of this issue will, to a great extent, determine the persuasiveness of each party's appraisal.

As to the comparable sales analysis, taxpayer's appraiser selected properties with substantial vacancy issues to determine the value of the substantially vacant subject property. The department's appraiser did not, effectively concluding that substantial vacancy on a given property would not affect the amount paid for that property.

As to the income approach analysis, taxpayer's appraiser made a deduction of approximately $4.7 million in lease-up costs to reflect the substantial vacancy of the subject property. The department's appraiser did not, again effectively concluding that substantial vacancy would not affect the value of the subject property as of the assessment date.

The second issue is that, notwithstanding the vacancy issue, the parties are still separated by roughly $2.3 million in RMV as determined by the income approach, on which both appraisers placed substantial or primary emphasis in their appraisals. This separation is the result

of competing determinations of market rent and income capitalization rates.[5]

This court will address both issues, beginning first with the effect, if any, that the substantial vacancy of the subject property has on its RMV as of the assessment date.

## A.  *Substantial Vacancy*

Before addressing the substantial vacancy of the subject property, it is worth repeating that the department does not dispute the fact of the substantial vacancy. In addition, the department's appraiser did not dispute *the type* of adjustments made by taxpayer.[6] Accordingly, the

---

[5] The parties also differ as to vacancy and credit loss and nonreimbursable expense rates. However, on closer inspection, these differences cancel each other out. Taxpayer claims an eight percent vacancy loss and a ten percent expense rate; the department claims a ten percent vacancy loss and an eight percent expense rate. In either calculation, the total deduction from the PGI is 17.2 percent, leaving an NOI that is 82.8 percent of the PGI.

[6] The department originally argued that such adjustments are not supported by the appraisal literature, and that for purposes of the income approach all rentable space on a property, including vacant space, must be considered as rented out at a market rate of rent, subject only to a deduction for a market standard vacancy and collection loss. (*See generally* Def's Trial Memo.) However, in light of the trial testimony of the department's appraiser (the witness) quoted below, such an argument is not supported by the evidence placed into the record.

"Mr. Laronge[, counsel for the department]: *** Is there a point—if you would look at this property and start saying, you know, this vacancy is not following market norms, like it's—it's been vacant for five years *** what happens then in terms of how you think about stabilization factors once it's outside market norm?

"*****

"The Witness: Well, rather than stabilization, I might consider a number of things. I look for comparables that were behaving that way, and if there were any—if there weren't any, then it might become a question of highest and best use ***. Then there is a decision as to how to go from there. So it really depends.

"The Court: Well, let's assume that you found some other properties that were behaving that way ***. That is, it was below what the Fred Meyer—you know, the big shops wanted, and it was above, at that point, the New Seasons and Whole Foods ***—what if the, sort of, 'This is irrelevant. It's a little bit irrelevant.' It was the size and outline of the past, but it's not the size and outline of today.

"Witness:  You're describing functional obsolescence ***.

"The Court: So now we have—so here's a possible functional obsolescence adjustment in the cost side of it. What would you do on the income side?

"The Witness: *** [O]n the income side, I would look at, basically, that there would be probably something where I'd have—I'd have to determine whether stabilization is even possible going forward or whether it has to be changed. ***

department's only dispute on the basis of this evidence is whether that vacancy has an effect on the RMV of this property. In other words, the issue is whether taxpayer's stabilization adjustments are appropriate as applied to the subject property as of the assessment date.

### 1. *Arguments of the parties*

Taxpayer argues, and has presented supporting evidence, that no market participant would pay the "stabilized" value determined by the income approach for a shopping center that is more than 50 percent vacant. Therefore, according to taxpayer, the subject property's value for tax purposes cannot be the stabilized value of the property. An adjustment must be made for the substantial vacancy.

The department argues that, notwithstanding the substantial vacancy caused by the vacant anchor space,

---

"The Court:  Let's assume you did think it was possible.

"The Witness:  Uh-huh.

"The Court:  But it was going to take time, and money, and lost rent, maybe some extra concessions to get there. Would you make any adjustment on the income?

"The Witness:  I think those—yes, I think those would be appropriate.

"The Court:  And then you would start making the adjustments?

"The Witness:  Yes.

"The Court:  And aren't those essentially adjustments—I'm not talking about quantitative. Aren't they qualitative adjustments that the plaintiff has made in this case on the income end of it?

"The Witness:  Yeah. I don't think this property falls into that—

"*****

"The Court:  Well, I think what you just told me is that if I—I might well use the techniques they use if I looked at the property and classified it as a value-added property as opposed to not. And then you would say, 'That's right, Your Honor, but you forgot you have to listen to my testimony a little bit. You've got to remember I'm here to tell you it isn't a value-add property. It's operating in the ordinary course or operating within the middle of [the] bell curve.' And then I would say, 'But Mr. Norling is telling me that it's a value-add.'

"The Witness:  So and that's our difference.

"The Court:  So this classification has nothing to do with leases or leased fee. It has to do with the market's perception of is this a wounded elephant [property] who's going to get well or is this an elephant who *** may never get well.

"The Witness:  That's right, Your Honor."

(Transcript at 598-604, Apr 19, 2016.)

the subject property was behaving in a stabilized fashion because the anchor space had only recently become vacant after an extended period of occupancy.[7] In the department's view:

"[The anchor space] was only vacant for 12 months as of the valuation date. Thus, as of the valuation date, the anchor space had spent 24 out of 25 years as occupied. In testimony, [the department's appraiser] assumed for the sake of argument that property would be vacant for another year. This corresponded to the 8 percent vacancy rate (2 vacant years out of 26 years is roughly 8 percent) used by [the department's appraiser] in his income approach."

The implication then, according to the department, is that the anchor space was not actually vacant for an *excessive* amount of time as of the assessment date.

The department further argues that the anchor space was not vacant for an excessive amount of time by relying on the fact that the anchor space was either occupied or leased until May 31, 2013, which is only seven months prior to the assessment date, and that a potential anchor tenant had already signed, on May 28, 2013, a letter of intent to lease the anchor space. The department's view is that, notwithstanding the vacant anchor space and the absence of any signed lease, the subject property was within market norms for filling the space within a reasonable time and was therefore behaving in a stabilized fashion. The department's appraiser notes, "[L]ocal commercial brokers familiar with shopping centers say that the typical time-frame to replace an anchor tenant similar to the subject is 6 to 18 months."

The question comes down to one of timing. Under taxpayer's theory, the RMV of a property decreases once an anchor tenant vacates the anchor space. Under the department's theory, the RMV of a property remains stable for a brief period after the vacancy of the anchor tenant—it is not until the anchor space exceeds a market expected vacancy period that an adjustment for the vacant anchor space may be made.

---

[7] Recall that, while the total vacancy of the property was 51 percent vacant as of the assessment date, 45.6 percent of that vacant space is attributed to the vacant anchor space. If the anchor space was filled, the subject property would be operating at a market standard occupancy rate.

2.   *Analysis*

Recall that, unless otherwise prescribed by law or regulation, methods of valuation are analyzed in light of the evidence introduced by the parties. *Bylund*, 292 Or at 585. Real and personal property is valued at 100 percent of its RMV, which is defined as "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller each acting without compulsion in an arm's-length transaction." ORS 308.232; ORS 308.205(1).

The court first considers the department's theory that the anchor space vacancy was within market norms because it was only vacant, or expected to be vacant, for two out of 26 years, or eight percent of the time since the last occupancy started. Under the department's theory, such a property, even if it is currently over 50 percent vacant, should be valued *exactly the same* as a property that is occupied subject only to market expected vacancy.

The error of the department's theory, if not apparent on its face, becomes clear if one considers a hypothetical anchor space that was leased and occupied continuously for a 50-year period. If that anchor space was vacated at the end of the lease term, then, under the department's theory, appraisers would not be able to take the substantial vacancy into account for assessment purposes until the eight percent vacancy rate threshold was reached.[8] That would not occur until approximately 4.5 years later.[9] The department offers no legal or factual support for such an analysis, and taxpayer has indicated that market participants do not share the department's strained statistical approach.

Of course, perhaps the department's theory was merely a check on the appraiser's assumption that the anchor space might take up to two years (total) to become occupied, and whether such a period of vacancy was outside the expectations of a buyer of a stabilized property. However, such a check is irrelevant to the determination of value as of the assessment date in the face of the testimony introduced by taxpayer.

---

[8] And other spaces are experiencing no vacancy.

[9] 4.5 years vacancy ÷ 54.5 years total = 8.26 percent vacancy rate.

The testimony introduced by taxpayer persuasively demonstrates that buyers of shopping centers lacking an anchor tenant would "absolutely" take such vacancy into account when determining what price to pay for the shopping centers. The department introduced no testimony to refute the reaction of market participants to a substantial vacancy in a shopping center.

Failing to introduce market evidence of its own, the department instead relied on briefing upon case law and appraisal theory that addressed two fundamental appraisal concepts: that (1) Oregon law requires appraisals to value all of the interests in the property, otherwise known as the fee simple estate and (2) to value the fee simple estate, appraisers must utilize market rents instead of contract rents in the income approach. *See Tetherow Golf Course v. Deschutes County Assessor*, 20 OTR 554 (2012); *Deschutes County Assessor v. Broken Top Club, LLC*, 15 OTR 231 (2000); *First Interstate Bank v. Dept. of Rev.*, 10 OTR 452 (1987), *aff'd*, 306 Or 450, 760 P2d 880 (1988); *Swan Lake Mldg. Co. v. Dept. of Rev.*, 257 Or 622, 625, 478 P2d 393 (1970); *see also* Appraisal Institute, *The Appraisal of Real Estate* 441, 447 (14th ed 2013).

These authorities do not assist the department. Taxpayer disputes neither concept. In fact, taxpayer's appraiser sought to value the fee simple estate. In doing so, taxpayer's appraiser used market rents to determine the PGI of the subject property in its income approach. However, taxpayer's appraiser made a sizeable—but substantiated— deduction for the lease-up costs that would be incurred by a hypothetical purchaser to fully lease or stabilize the property. This approach is entirely consistent with the market testimony of taxpayer's witnesses and unrefuted by the department, as is the consideration of substantial vacancy in taxpayer's sales comparable analysis.

Viewing this issue in another light, the parties in this case both agree on the highest and best use of the subject property. The highest and best use is continued use as a shopping center, which is expected to earn income. And the evidence in this case shows that the department's appraiser agrees that the type of income approach adjustment made by

taxpayer's appraiser is theoretically appropriate as applied to shopping centers, just not as applied to the subject property on the assessment date. *See* 22 OTR at 431 n 6. That is an issue quite distinct from whether taxpayer's appraiser is valuing the fee simple estate or using market rents in his analysis. The department's arguments are not persuasive, and this court finds the approach of taxpayer persuasive.

In adopting taxpayer's approach, the court comments upon the testimony of taxpayer's appraiser, in which he says of the $4.7 million deduction for lease-up costs, "there is no source that I can state where it says that it's appropriate valuation methodology to account for stabilization costs within the context of a fee simple analysis." In another case, such an admission might well be fatal to that party's appraisal. *See Dept. of Rev. v. River's Edge Investments LLC*, 21 OTR 469, 475 (2014) ("If not adequately justified, [a serious departure from appraisal practice] would lead the court to place no reliance on the appraisal of the expert who took the departure.").

However, this case is a good example of why methods of valuation are analyzed *in light of the evidence* introduced by the parties. *Bylund*, 292 Or at 585. Under the department's theory, the unstated presumption must be that the owner of an income producing property has the ability to— with minimal time and cost—fill any vacancies on the subject property. With respect to the appraisal literature, upon which the department relies, the presumption is explicit: "When the fee simple interest is valued, *the presumption is that the property is available to be leased at market rates*." *The Appraisal of Real Estate* 441 ("Interests To Be Valued" text box) (emphasis added).

Here, taxpayer has introduced sufficient evidence to test and, in this court's opinion, rebut that presumption. Taxpayer showed that there were significant hurdles to be jumped and funds to be expended to seek out and secure an anchor tenant.[10]

---

[10] In this case, the substantial vacancy is caused primarily by the absence of an anchor tenant. The court makes no determination on whether the analysis would change if the substantial vacancy was caused by a number of inline or junior anchor tenant vacancies. In addition, in this case, there was no lease

Those hurdles and costs are the result, in part, of approvals required of the city for any buildout of the anchor space. *Id.* According to a preliminary letter from the City of Portland, any building permit valued at $145,200 or more may require that up to ten percent of the total permit value must be spent on nonconforming use and other property upgrades, such as "parking lot landscaping, bicycle parking, pedestrian connections and screening * * * ADA upgrades, seismic upgrades and storm water improvements." The estimated costs necessary to secure the interested anchor tenant in this case total approximately $2.6 million, which include a tenant allowance of $1 million. During the time necessary to plan and seek approval for the buildouts, the *available* anchor space *is not income producing.*

These factors alone support an adjustment for the substantial vacancy of the subject property. Yet, taxpayer also showed that the anchor tenant vacancy specifically affects the market value of a shopping center in a way manifestly different than that of vacancy of smaller inline shops. The vacancy of the anchor space causes a ripple effect to other rentable spaces on the property. It is a practice in the marketplace for smaller shops to condition the amount of their rent payments or length of their lease on the presence of an anchor tenant. Taxpayer has justified the $4.7 million deduction in lease-up costs from the income approach, and the consideration of substantial vacancy in the sales comparable approach.

Finally, nothing in the record suggests that the approvals needed, the nonconforming upgrades required, or estimated funds and time necessary to place an interested anchor tenant into the subject property are unusual or outside market norms. They cannot accordingly be deemed to be attributable to poor property management, which would go to actions or skills of the particular owner and would accordingly not be relevant for purposes of property assessment and taxation. *See Seneca Sustainable Energy, LLC II v. Dept. of Rev.*, 22 OTR 263, 272 (2016) ("Appraisal theory requires that an appraiser ignore the skill of any particular

---

obligating a new anchor tenant to occupy the anchor space after the vacancy of the prior anchor tenant. Such a fact might also change the analysis.

potential owner or purchaser and focus instead on typical management skill.").

Given the significant vacancy of the property, the lack of an anchor tenant, the costs and processes associated with attracting and retaining a new anchor tenant, and the lack of a signed lease signifying the retention of a new anchor tenant, this court finds that the RMV of the subject property was significantly impaired. Taxpayer's appraiser appropriately considered comparable sales with significant vacancy issues for the sales comparison approach and adjusted the stabilized RMV determined by the income approach to determine the actual RMV of the subject property. Accordingly, the department's sales comparison analysis is rejected and, to the extent that it does not make a deduction for the substantial vacancy of the subject property, the department's income approach analysis is rejected.

B.   *Market Rent and Income Capitalization Rates*

Having concluded that taxpayer's appraisal is more persuasive on how to take into account the substantial vacancy of the subject property, the court now focuses on the remaining $2.3 million difference between the parties in their income approach analyses. The court first begins with the market rent rates.

1.   *Market rent rates*

As previously explained, the appraisers determined identical market rents for the anchor and junior anchor spaces. The only disagreement is the market rent attributable to the inline spaces on the subject property. Nevertheless, that disagreement results in a $121,720 difference in the PGI of the subject property, or approximately $1.3 million in value.[11] The court discusses each appraiser's analysis in more detail before explaining why the approach of taxpayer's analysis is more persuasive.

With respect to the inline spaces on the subject property, taxpayer's appraiser initially determined two

---

[11] Depending on the capitalization rate used, the $121,720 difference in PGI results in a valuation difference of either $1,343,787 (using the department's 7.5 percent capitalization rate) or $1,259,800 (using taxpayer's eight percent capitalization rate).

separate market rents, one for larger inline spaces (which included the corner inline space), and one for smaller inline spaces. For the smaller inline spaces, taxpayer's appraiser determined a market rent of $18.00 per-square-foot. For the larger inline spaces, taxpayer's appraiser determined a market rent of $13.00 per-square-foot. However, taxpayer's appraiser made adjustments to the large inline space market rent rate for two of the larger inline spaces. First, taxpayer's appraiser adjusted the market rent rate down to $10.00 per-square-foot for the corner inline space because of "its inferior exposure, access, and overall utility." Second, taxpayer's appraiser adjusted the market rent rate up to $18.00 per-square-foot for the largest of the large inline spaces and determined separate market rents for the large inline space because of its "high exposure end cap location at the northeast corner of the property."

The department's appraiser determined one market rent for the various inline spaces. That market rent was $19.00 per-square-foot.

Both appraisers conducted competent comparable rent analyses under their respective approaches. As far as volume of support, both appraisers included the same number of rent comparables. That said, the court notes that, by not distinguishing between types of inline spaces, the department's appraiser had more support for its conclusion of the market rent for the inline spaces. However, in comparing taxpayer's smaller inline market rent rate and the department's general inline market rent rate, the difference of $1.00 per-square-foot is not significant.

The difference becomes significant when considering the disparity between taxpayer's determination of the large inline and corner inline market rents, and the department's determination of the general inline market rent.[12] The court finds taxpayer's sensitivity to the positioning, visibility, utility, and relative size of the various inline spaces to be more persuasive when determining what rent rate would be used in a market transaction for such inline spaces. The

---

[12] But note that the largest of the large inline spaces was determined by taxpayer's appraiser to share the $18.00 per-square-foot market rent rate as the smaller inline spaces.

court agrees with the determination of taxpayer's appraiser of the market rent rates.

### 2. *Income capitalization rate*

At this point, the only significant appraisal difference remaining is the income capitalization rate. Taxpayer's appraiser determined a capitalization rate of eight percent, whereas the department's appraiser determined a capitalization rate of 7.5 percent. Given taxpayer's determination of an NOI of $1,196,528, the competing capitalization rates result in approximately $1 million of difference in value.

Both appraisers conducted a market extraction analysis to determine the market capitalization rate by looking at sales of other properties, and comparing those rates to local or national trend data. Both appraisers also compared the individual characteristics of the sales reviewed to the characteristics of the subject property. Taxpayer's appraiser opted to quantify the effect of such characteristics on the capitalization rate. The department's appraiser opted to qualitatively reflect how good of an indicator of the capitalization rate each property was.

Neither party expended much briefing on the determination of the capitalization rate. However, taxpayer points out one significant flaw with the capitalization rate determined by the department's appraiser: the appraiser "did not adjust his capitalization rate—which was based on the six sales [of fully stabilized properties] in his sales-comparison approach—to account for the Shopping Center's anchor vacancy."

The court agrees with taxpayer. At first blush, determining a capitalization rate based upon the substantial vacancy of the subject property might appear to be a form of double deduction, given the $4.7 million deduction of lease-up costs attributable to stabilizing the substantial vacancy of the subject property.

However, the $4.7 million deduction reflects the reduction of income and the amount of funds and time necessary to achieve stabilization. The deduction does not account for the increased risk of the property associated with achieving stabilization, which taxpayer's capitalization

rate does. The approach of taxpayer's appraiser appropriately calculates the PGI and NOI of the property as if it was stabilized; it infers a value of the property based on the increased risk associated with the property not being stabilized; and then it deducts the loss of rent and lease-up costs necessary to get the property to income stabilization.

## V.   CONCLUSION

The court concludes that the appraisal of taxpayer more likely than not determines the correct valuation of the subject property. The department's failure to account for the substantial vacancy of the subject property renders its sales comparison analysis unpersuasive. That same failure greatly impairs the persuasiveness of the department's income approach analysis. Taxpayer's determination of market rents and the capitalization rate in the income approach are more persuasive. Finally, although not previously discussed, taxpayer's failure to conduct a cost approach analysis does not undermine the persuasiveness of its appraisal. Both appraisers agreed that the income approach to value is a much better indicator for the subject property, and the department's appraiser gave little weight to the value determined by its cost approach. Now, therefore,

IT IS THE OPINION OF THE COURT that the value of the subject property is $10,130,000.