Argued December 14, 1955, peremptory writ ordered March 28, 1956

# STATE ex rel MEDFORD PEAR CO. v. FOWLER

### 295 P. 2d 167

*Philip B. Lowry,* Medford, argued the cause for relator.

*Carlisle B. Roberts* and *Theodore W. deLooze,* Salem, argued the cause for defendant.

ROSSMAN, J.

This cause came before the court when the relator, pursuant to Oregon Constitution, Art VII, § 2, filed with our clerk a petition for an alternative writ of mandamus directed to the assessor of Jackson county, and the court, following a study of the petition, assumed jurisdiction. Subsequent to service upon him of the alternative writ, the assessor, Robert G. Fowler, filed an answer, and later the relator presented his reply. The pleadings revealed some issues of fact. Presently the defendant moved "for an order dissolving the alternative writ of mandamus for the reason and on the ground that it is now moot." Before that motion was determined, the parties, for the purpose of enabling us to decide the entire case, presented a stipulation as to some of the facts and an extensive deposition of defendant Fowler as to the remainder.

A brief statement of some incidents will disclose the issues which await decision. The relator is the owner of a commercial orchard property in Jackson county. Sometime prior to June 3, 1955, the defendant, as assessor, in preparing the county's assessment roll for the fiscal year beginning July 1, 1955, assessed the value of the relator's land and entered it as $15,790. That sum included nothing for the orchard trees. Prior to 1955 orchard trees were not assessed in Jackson county. June 3 the Jackson County Board of Equalization, to which we will hereafter refer as the board, received an order from the State Tax Commission

directing it to assess the value of the relator's trees and to add the amount to the aforementioned sum of $15,790. Similar orders were given concerning all other orchard properties. In issuing its orders, the tax commission was prompted by ORS 307.010 and a construction of it which had recently been announced by the Attorney General. June 10 the board protested that insufficient time was available to comply with the tax commission's order and indicated an intention not to assess the trees. June 17 the tax commission reiterated its order, and on July 25 the board complied with the commission's order. In the instance of the relator it determined the value of the trees as $12,070. The total assessment thus became $27,860 and an appropriate entry was made in the county's assessment roll. At that juncture the relator contested the increased assessment through an appeal to the tax commission. The basis of the appeal was an alleged failure of the board to have given notice before it made the increases. The tax commission sustained the appeal of the relator and of the other orchard owners who also had appealed; it ruled that the increased assessments were void and cited as the basis of its ruling ORS 309.090(1). The condemned assessments, however, were not deleted from the assessment roll. Their removal is demanded in the alternative writ.

We will now mention the second phase of the relator's prayer for relief. When the defendant assessor calculated the rate per cent as required of him by ORS 310.090, he employed in his computations the void assessments which the board had placed upon the orchard trees. The relator claims that inclusion of those sums in the totals rendered the rate per cent inaccurate. It demands a calculation of the rate per cent unaffected by the void assessments.

We come now to the third aspect of the relator's prayer. When the petition for an alternative writ was filed October 20, 1955, the defendant had not yet delivered the tax roll to the tax collector of the county. ORS 311.115 requires the assessor to deliver the tax roll "to the tax collector not later than 30 days prior to the date provided by law when any tax or part of tax appearing in the roll becomes due and payable." The date specified by ORS 311.505 for the payment of taxes is November 15.

The alternative writ commanded the defendant (1) to correct the assessment roll "by deleting therefrom all the increases in assessments on commercial orchard property entered by you, or at your direction, upon said assessment roll pursuant to the void order of the Jackson County Board of Equalization dated July 25, 1955"; (2) "immediately after the receipt of this Writ to forthwith deliver said assessment roll to the sheriff of Jackson County"; and (3) "immediately after the receipt of this Writ to compute a rate per cent of levy upon the legally assessed valuation of Jackson County, Oregon, in an amount sufficient to meet the budgeted requirements of Jackson County, Oregon, and the subdivisions thereof." The alternative which the writ afforded the defendant, in the event he did not obey the commands just mentioned, was opportunity to "show cause before this court on the 31st day of October, 1955, why you have not done so."

We see from the foregoing that one of the sources of the controversy before us is in the assessment which was made July 25, 1955, of the relator's orchard trees. The relator does not challenge the assessment which was made of its land and does not deny its duty to pay the tax levied upon it.

Previous paragraphs of this opinion state that the assessments which the board made July 25 of the value of the various orchard properties were ruled void by the tax commission. The latter, in fact, ruled twice in condemning the assessment which the board had made of the trees. One ruling occurred September 7 and the other September 14. The following recital of the writ, which is admitted as true by the return, states the situation:

> "* * * the Oregon State Tax Commission entered orders dated September 7, 1955 and September 14, 1955, declaring said order of the Jackson County board of equalization dated July 25, 1955 void and held that all proceedings thereunder were illegal."

The above establishes that the tax commission undertook to relieve the relator and other owners of orchard properties of the assessments upon their trees which the board made July 25. But, notwithstanding the commission's orders, the increased assessments were not removed from the assessment roll; in fact, the assessment upon the trees as entered in the assessment roll was transferred to the tax roll when the latter was compiled. The relator contends that the presence of the assessments in the assessment roll constitutes a cloud upon the title to the many orchard properties.

Although the tax commission nullified the assessment of the trees which the board had made, it did not declare that the taxes of the owners of the orchard properties should not be based upon the combined value of the land and the trees. It held the challenged assessments void solely because the board had not given the notice demanded by ORS 309.090 before it increased the assessments.

Thus, by not later than September 14 the tax com-

mission had ruled that the assessments upon the trees which were made July 25 were void.

We now move on to an assessment of the county's orchard trees which was made by the tax commission. The return states that September 14 the tax commission resolved to embrace the authority granted to it by ORS 309.400 and act as the board of equalization for Jackson county. The reply denies that averment, but testimony given by the assessor confirms it. The assessor's unchallenged testimony indicates that he did not delete from his assessment roll the entries which represented the valuations of the trees because a representative of the tax commission instructed him not to do so, and told him that the commission wished to employ the entries incidental to its assessment of the trees. Beginning June 5, 1952, as the result of an agreement between itself and the county, the commission had begun the task of reappraising all properties in the county and had thereby acquired familiarity with local properties. By not later than September 14 the commission centered its efforts in the orchard properties. In the meantime, notices had been given and hearings were conducted. The commission's appraisers classified the orchards into categories A, B and C.

Orchards which they classified A were appraised at $300 per acre; classification B was assigned an appraisement of $225 an acre. In the meantime, according to the assessor, the tax commission took charge of his assessment roll and made entries in it. October 26 the commission completed its work and returned him his roll.

The record does not disclose the amounts of assessment which the tax commission's appraisers placed upon the property of the relator. Nor does it give simi-

lar information as to other properties. However, it is clear that assessments of the various properties were made by the tax commission's appraisers and that amounts were entered in the assessment roll. The assessments of the trees, as made by the local board July 25 and those made later by the tax commission, were within $40,000 of each other. From what we have said so far it might appear that the orchard properties were entered in the assessment roll twice, once under the appraisal that was made July 25, and which was later ruled void by the tax commission, and a second time by the tax commission acting in lieu of the local board of equalization. However, the evidence warrants a belief that when the tax commission acted in lieu of the Jackson County Board of Equalization it adopted the appraisals made July 25 wherever the two conformed and that in other instances it appropriated the parts of the previous entries that were suitable to its purposes.

On October 20, 1955, the relator filed the petition for an alternative writ of mandamus. At that time the tax commission had not completed its assessment work and it still retained control over the county's assessment roll. October 26 the tax commission, as we have seen, completed its examination and correction of the assessment roll. On that day it returned the assessment roll to the assessor. By citation to ORS 311.115 and 311.505 we have shown that the tax roll should have been delivered by the assessor to the tax collector not later than October 15. On October 26, after the assessor had received the assessment roll as revised by the tax commission he delivered the tax roll to the tax collector. On that same day this court issued the alternative writ of mandamus. We are satisfied that the defendant assessor delivered the tax roll to the tax collector before

he was apprised of the action which we had taken and that he was prompted by good faith. It will be observed that the assessor acted as promptly as was possible, for until the assessment roll was placed in its final form the tax roll could not be delivered to the tax collector.

■ The foregoing completes a delineation of the facts pertaining to the void assessments of the trees. It is certain that the properties of the orchard owners are not liable to a double tax, one based upon the value of the trees as determined by the local board of equalization and the other based upon the value set by the tax commission. The record shows that the assessor entered in the tax roll only the amount of the levy which was based upon the assessments made by the board of equalization July 25, but the lien of taxes is governed by the entries in the assessment roll. ORS 310.100 and 311.105. The record does not clearly disclose the nature of the entries which the defendant made in the assessment roll concerning the orchard properties. A previous paragraph sets forth the only information concerning those entries that we have been able to glean from the record. The relator has not challenged the assessment of the trees made by the tax commission after it began its evaluation work about September 7. Since the entries made by the tax commission are not challenged, they should not be stricken from the assessment roll. But all entries based upon the assessments made by the Jackson County Board of Equalization, and which were not adopted by the tax commission when it made its entries, should be deleted from the assessment roll. The phrasing of the part of the mandate which carries that direction into effect we leave to subsequent determination.

■ We shall now consider the charge that "the

purported assessment roll of Jackson County, Oregon, is in the possession of the defendant and has not been delivered to the sheriff of Jackson County, Oregon, as required by ORS 311.115, * * *." A preceding paragraph of this opinion, through citation to ORS 311.115 and 311.505, shows that delivery of the assessment roll to the tax collector, in counties wherein the assessment roll becomes the tax roll upon its delivery to the tax collector, must be made not later than October 15. It seems reasonable to infer that, in counties which prepare as separate entities an assessment roll and a tax roll, the latter must be delivered to the tax collector on the same day (October 15) that delivery would have been due had the two been parts of a single document. Jackson County prepares as separate documents a tax roll and an assessment roll. The defendant assessor, as we have seen, did not deliver the tax roll to the tax collector until October 26. The relator manifests a belief that the assessor did not make delivery until after he had received information concerning the action which this court took on October 26, and that he then made hasty delivery of the roll containing the taxes which were computed upon the void assessments, for the purpose of rendering it impossible for this court to order him to alter the entries. Our consideration of the evidence persuades us that the assessor acted in good faith and that he delivered the tax roll to the tax collector before he was informed of the action we had taken. He could not have made delivery sooner because the tax commission had not completed its entries in the assessment roll until a few minutes before he delivered the tax roll to the tax collector.

The above facts seem to indicate that the issue pertaining to delivery of the tax roll has become moot. However, the document which the defendant delivered

to the tax collector was the tax roll, whereas the mandate of the writ commands as follows: "You are commanded * * * immediately after the receipt of this Writ to forthwith deliver said assessment roll to the sheriff of Jackson County * * *." Thus the mandate orders the delivery, not of the tax roll, but of "said assessment roll." The writ constantly speaks of the assessment roll and employs the term "tax roll" in a single instance only. In that one exception the term "tax roll" appears in a quotation which the writ makes from ORS 311.115 in an effort to portray the law which governs the assessment roll. It seems clear that the writ's concern is with the assessment roll. The following excerpts which we take from the writ warrant our statement. The writ, referring to the "assessment roll" and the alleged duty of the defendant pertaining thereto, says:

"* * * the purported assessment roll of Jackson County, Oregon is in the possession of the defendant and has not been delivered to the sheriff of Jackson County, Oregon, as required by ORS 311.115, * * *."

After the alternative writ at that point quoted from ORS 311.115, it continued as follows:

"That in the event a valid and corrected assessment roll is not delivered to the sheriff forthwith, all taxpayers of Jackson County, Oregon will lose the benefit of any tax discounts provided by law."

The writ also says:

"* * * the public interest requires that the defendant forthwith deliver to the sheriff of Jackson County, Oregon, a valid and properly computed assessment roll."

The writ attributes to the assessor no dereliction with the tax roll. We are, therefore, required to determine

whether the assessor owed a duty to have handed the assessment roll to the tax collector.

The record shows that Jackson county, in the assessment of property and in the collection of the levied taxes, no longer employs the bulky volumes which, until recently, were a familiar sight in the offices of all assessors and tax collectors. When those volumes were in the assessor's office, where they were prepared, they were known as the assessment roll, but when they were transferred, October 15 to the tax collector's office they became known as the tax roll. ORS 311.115. Since the entries in the volumes pertained only to the current year, a new set of volumes was prepared annually. The entries on the pages may be illustrated by resort to an example afforded by the record before us. Each page, in the instance mentioned in the record, was headed on the one half with "Jackson County, Oregon, Assessment Roll for 1954" and on the other half with "Jackson County, Oregon, Tax Roll for 1954." The assessor wrote under those headings the appropriate entries and after he had completed the roll carried the volumes, October 15, to the tax collector's office.

Beginning with the fiscal year 1955 Jackson county inaugurated a new system which abandoned the use of the bulky volumes and in lieu of them resorted to cards. The entries in the volumes had been made by hand; those upon the cards are made by bookkeeping and typewriting machines. Whereas the volumes had to be replaced annually, the cards afford space for ten years' entries. Since Jackson county has 33,000 taxpayers, 66,000 cards are necessary. One half of the cards are labeled "Continuing Real Property Assessment Roll of Jackson County, Oregon." The other 33,000 cards are entitled "Continuing Tax Roll of Jackson County, Oregon." The cards representing the

assessment roll remain permanently in the assessor's office, but the tax roll, after its preparation, is delivered to the tax collector.

The relator does not concede that our legislation makes provision for separate assessment and tax rolls. We will now analyze the governing statutes.

ORS 311.115 says:

"After attaching the warrant as required by ORS 311.110, the assessor shall deliver the roll to the tax collector not later than 30 days prior to the date provided by law * * *. The assessment roll thereafter shall be a tax roll."

Jackson county employed that method until 1955, and many of Oregon's counties still employ it. It is clear, as we have noted, that the assessor made no attempt to deliver to the tax collector a document of the kind described in ORS 311.115.

ORS 308.220 says:

"(1) The assessment roll and tax roll of each county shall be made out in tabular form, in separate columns with appropriate headings, for assessments of properties, extensions of tax levies, for payments, foreclosures, redemptions, issuance of deeds and other entries as contemplated by law. Assessments of real property and of personal property shall appear separately and the assessment roll and tax roll may be divided into separate parts for that purpose. The assessment roll and tax roll may be in bound volumes or in loose sheets numbered consecutively, and the assessment roll may be in volumes or sheets apart from those of the tax roll.

"(2) With the approval of the State Tax Commission, the assessment roll and the tax roll of any county may be prepared as continuing rolls, covering two or more years, but all proceedings in the

assessment and taxation of property for each year shall be separately exhibited therein.

"(3) In the assessment roll and tax roll of each county, in addition to the other columns, * * *."

ORS 308.220 plainly contemplates the preparation of two documents: (1) an assessment and (2) a tax roll. The two may be united on one sheet or they may be entered in separate and distinct entities. ORS 311.115 just as plainly contemplates a single document called an assessment roll which, upon transfer to the sheriff's office, becomes the tax roll. That situation discloses an inconsistency between the two enactments.

■■ The relator wishes us to read the words "and tax roll" in ORS 308.220 as the equivalent of "the assessment roll after delivery to the sheriff," but such a paraphrasing would, in our opinion, contravene the clear purpose of the section. It will be recalled that it provides that "the assessment roll may be in volumes or sheets apart from those of the tax roll." ORS 311.115 has remained in its present form since 1935: Oregon Laws 1935, ch 305, § 1. The differentiation between "assessment roll" and "tax roll" appearing in ORS 308.220 was created in 1941: Oregon Laws 1941, ch 359, § 2. It is well settled that amendments or repeals by implication are not favored by the courts, but neither are they refused recognition in clear cases. *State v. Buck,* 200 Or 97, 262 P2d 495. If the enforcement of an earlier statute would thwart the purpose of a later one, resort will be had to the doctrine of repeal by implication. *Columbia River-Longview Bridge Co. v. Wellington,* 140 Or 413, 13 P2d 1075. The same reasoning applies to amendments by implication. 82 CJS, Statutes, p 418, § 252.

■ The above analysis convinces us that the later statute (ORS 308.220) had the clear purpose of pro-

viding a system whereby the assessor could prepare separate rolls, one for assessment and one for taxation. The relator insists that the contents of the tax roll is nowhere defined. However, ORS 308.215 and 308.220 set forth the entries which must be made in the assessment roll, and ORS 308.220 prescribes the data which must be entered in the tax roll. An examination of the "Continuing Tax Roll of Jackson County, Oregon" accompanying the stipulation in this case reveals that provision is made on that form for all the information required by ORS 308.220.

■■ We believe that the necessary implication of ORS 308.220 is to effect an amendment of ORS 311.115 to the extent that it is the tax roll which must be delivered to the sheriff in counties which prepare assessment rolls and tax rolls as separate documents. Accordingly, the assessor owed no duty to deliver to the tax collector the assessment roll.

■ We now pass on to the remaining contention that the assessor has not computed the rate per cent as required by ORS 310.090. The alternative writ recites:

"'* * * the defendant has computed the rate per cent of levy for Jackson County, Oregon upon the basis of said illegal assessments. That the per cent of levy so computed is insufficient to raise the amount of revenue required for the budgets of said county and the subdivisions thereof in accordance with their budget requirements.'"

The unchallenged testimony of the assessor, given under examination by the relator's counsel, follows:

"Q Is the rate per cent of levy for Jackson County and its subdivisions inadequate to meet the budget requirements of Jackson County and its subdivisions?

"A No, the levies were figured with the orchards in, so it should be all right.

"Q Didn't the Tax Commission purport to make some changes?

"A There were some changes made after the State acted as a Board of Equalization.

"Q Wasn't the total assessed valuation of the County reduced by their attempted action?

"A About forty thousand dollars—no, not that much; if I remember rightly, it was right at forty thousand, or just below.

"Q When you originally computed the rate per cent of levy, it was the amount required to meet the budgeted requirements?

"A Yes.

"Q Then any reduction in the assessed valuation, if the millage rate were constant, would result in a rate per cent levy less than the budgeted requirements?

"A I don't believe it affected anyone very much. This reduction was scattered over thirty-six taxing districts. It meant about twenty-five hundred dollars in taxes divided among those districts.

"Q We would have to say, however, would we not, that the final rate per cent of levy would not meet the budgeted requirements of all those various taxing subdivisions?

"A I don't believe it would affect them very much; probably some of them would never know it.

"Q The law requires you to compute a rate per cent of levy that will meet the budgeted requirement?

"A Yes.

"Q And that's irrespective of whether it will affect them very much or not?

"A That's right.

"Q Then we would have to say, in this case, that the rate per cent of levy applied here was inadequate?

"A I don't think I could go that far. We always have corrections to make after the tax roll is made

over. Those corrections all mean something to a taxing district.''

From the foregoing we notice that the assessor, in making his computations, employed the assessments which the tax commission had ruled were void, whereas he should have employed the assessments made by the tax commission in the work which it began September 14 and finished October 26. The difference in the total amount of the assessments was not over $40,000, and the difference in the amount of the tax was ''about twenty-five hundred dollars in taxes divided among those districts.'' (36 of them) Such are the facts. But the record fails to indicate that the rate per cent, as computed by the assessor, will fail to produce the required amount of revenue.

The above constitutes our disposition of the contentions presented by the relator. We have found no merit in any of them, with the exception of the one which is based upon the fact that the void assessments were not deleted from the assessment roll. As we have determined, those entries should be stricken from the roll except so far as the tax commission later adopted them.

In order to make our ruling clear, we add that the action taken by the tax commission has not been an issue in this case. No relief has been asked against anything which that agency did. We have made no effort to determine the validity or invalidity of anything done by that body since July 25, 1955.

A peremptory writ will issue for the above purposes.

LATOURETTE, J., did not participate in the decision of this case.