NELSON, J.
**784 In this direct appeal from the Regular Division of the Tax Court, the Department of Revenue argues that the Tax Court erred in concluding that it had jurisdiction to consider a challenge brought by Seneca Sustainable Energy LLC (Seneca) to the department's determination of the real market value of Seneca's electric cogeneration facility and the notation of the real market value on the assessment roll for two tax years, 2012-13 and 2013-14. The department also argues that the Tax Court erred in concluding that the department's determinations of the property's real market values for the 2012-13 and 2013-14 tax years were incorrect and in setting the values at significantly lower amounts. For the reasons set out below, we affirm the Tax Court's rulings.
BACKGROUND
The following facts are undisputed. In 2009, Seneca began construction of a biomass cogeneration facility on property that it owns outside of Eugene, Oregon. The cogeneration facility would generate electricity by burning wood waste produced by Seneca's nearby *362 sawmill. Around that time, Seneca also began negotiating a long-term power purchase agreement, under which it would sell the electricity generated at the cogeneration facility to the Eugene Water and Electric Board (EWEB); Seneca and EWEB ultimately finalized the power purchase agreement in February 2010.[1] Among other things, the agreement set the rates that EWEB would pay for electricity, capacity, and renewable energy credits (RECs).[2] **785 Seneca's facility is located in an area designated as an "enterprise zone."[3] Seneca applied to the enterprise zone sponsors, the City of Eugene and Lane County, to have the facility exempted from ad valorem property tax on its improvements during the first three years it was in operation, as permitted under the Oregon Enterprise Zone Act, ORS 285C.045 through 285C.659. The sponsors granted the application with conditions, including a condition that Seneca pay a public benefit contribution for each year that it failed to meet certain economic development and employment goals. The public benefit contribution would be a percentage of the amount of ad valorem property tax that Seneca would have had to pay in the relevant year without its exemption. The amount of property tax that Seneca would have had to pay, in turn, would be based on the department's determination of the real market value of the structures, machinery, and equipment that constitute Seneca's industrial property under ORS 306.126 (requiring department in cases like Seneca's to determine the real market value of industrial property and to advise the county assessor of that value).[4]
Seneca's cogeneration facility was completed and became operational in April 2011. The department therefore determined the real market value of Seneca's industrial property for the first time for the 2012-13 tax year. At that time, the department determined that the real market value of Seneca's exempt industrial property was $62,065,350.[5]
**786 Under ORS 285C.175(7), for each year that a property is exempt from taxation under the enterprise zone statutes, the county assessor is required to enter a notation in the property tax assessment roll showing the assessed value of the property and the amount of additional taxes that would have been due without the enterprise zone exemption.
*363 [6] Accordingly, the department reported the real market valuation of Seneca's industrial property to the Lane County assessor, who then entered it as a notation on the assessment roll. Because of the enterprise zone exemption, no property tax was assessed against most of Seneca's industrial property for that tax year, or, as relevant here, for tax year 2013-14. Notably, however, for each tax year, part of Seneca's industrial property was not tax exempt. Seneca paid property taxes on the real market value of its nonexempt industrial property for both the 2012-13 and 2013-14 tax years.
Seneca failed to meet its economic and development goals for tax year 2012-13. The enterprise zone sponsors therefore imposed a public benefit contribution under the enterprise zone contract provisions. Using the department's real market value determination for Seneca's exempt industrial property, as noted on the assessment roll by the county assessor, the enterprise zone sponsors calculated the public benefit contribution by first determining the amount of tax on the industrial property that Seneca would have owed had that property not been exempt and then multiplying that amount by the percentage set out in the enterprise zone contract. Ultimately, the zone sponsors required Seneca to pay a public benefit contribution of $217,781 for the 2012-13 tax year. Seneca again failed to meet its economic and development goals the following year, and the zone **787 sponsors imposed a public benefit contribution of $199,874 for tax year 2013-14.
THE TAX COURT PROCEEDING
Seneca objected to the amount of the 2012-13 public benefit contribution but paid it under protest in September 2013. Shortly thereafter, it filed the present action in the Tax Court against the department, Lane County, and the City of Eugene, challenging the department's determination of the property's real market value, the assessor's notation of the assessed value of the property under ORS 285C.175(7), and the enterprise zone's sponsors' imposition of the public benefit contribution. Specifically, Seneca sought five forms of relief: (1) a determination that the real market value of its industrial property did not exceed $30 million for the 2012-13 tax year; (2) an order requiring the department and Lane County to place the appropriate real market value and tax exempt value on the "tax rolls"[7] ; (3) an order directing the zone sponsors to recalculate the public benefit contribution using the correct real market value; (4) an order directing that any tax refund be paid with statutory interest; and (5) an order requiring the payments of costs, disbursements, and expert and attorney fees.
The department and the county moved to dismiss Seneca's complaint on the grounds that the Tax Court lacked jurisdiction over the action and that Seneca lacked standing to bring its complaint. In April 2014, the Tax Court issued an Amended Order granting in *364 part and denying in part the **788 department's motion to dismiss. Seneca Sustainable Energy v. Lane County Assessor , 21 OTR 366, 2014 WL 1366203 (2014). The Tax Court ruled that it had jurisdiction to hear Seneca's appeal of the department's determination of the real market value of the exempt property, the county's notation of that value on the assessment roll, and Seneca's request for an order that the tax roll properly reflect what the statutes require be placed on it. Id . at 368-70. The Tax Court also implicitly ruled that Seneca had standing to bring those claims. Id . In addition, it ruled that it had jurisdiction over the claim related to the tax refund as well as the claim for costs, disbursements, and certain fees. Id . at 373. However, the court granted the department's motion to dismiss Seneca's appeal of the imposition of the public benefit contribution, because, the court concluded, those claims arose out of Seneca's enterprise zone agreement with the zone sponsors and not under the tax laws of this state.[8] Id . The Tax Court ordered the parties to proceed to trial on Seneca's appeal of the real market value determination and the placement of the allegedly excessive assessed value on the tax rolls. Id . at 374.
Meanwhile, in December 2013, Seneca filed a second complaint in the Tax Court, challenging the department's real market valuation of its industrial property for the 2013-14 tax year and the placement of that value on the tax rolls. Seneca's complaint concerning the 2013-14 tax year did not assert any claim relating to the public benefit contribution, nor did it name the City of Eugene as a party. In November 2014, the Tax Court granted Seneca's motion to consolidate the two cases for trial.
The Tax Court conducted an eight-day trial in April 2015 in the consolidated cases. The issues before the court were the determinations of the real market value of Seneca's industrial property as of the assessment dates for the 2012-13 and 2013-14 tax years, viz. , January 1, 2012, and January 1, 2013. Notably, as a sanction for a discovery violation, the Tax Court prohibited the department from introducing evidence concerning the real market value of the **789 property for the 2013-14 tax year.[9] Both sides presented evidence and expert testimony regarding the proper methods for determining the real market value of a cogeneration facility, the income that that facility could be expected to produce, and the markets for electricity, generating capacity, and RECs. In addition, the Tax Court admitted into evidence appraisals of the property prepared by each party's valuation expert, as well as all the supporting documentation. In accordance with the Tax Court's sanction order, the department submitted evidence pertaining to the real market value of the property only as of January 1, 2012.
For the 2012-13 tax year, the department's appraiser valued the property at $59.9 million. The department's appraiser based his valuation of the property on the terms of Seneca's power purchase agreement, which he considered to be reflective of the market rates during the relevant time frame. Seneca's appraiser valued the property at $34.9 million for the 2012-13 tax year and at $18.2 million for the 2013-14 tax year. Seneca's appraiser relied generally on "spot" market electricity prices on the assessment dates and did not rely on the rates that EWEB actually paid to Seneca for electricity under the power purchase agreement. The Tax Court issued an opinion rejecting the department's appraisal as fundamentally flawed in numerous respects, generally agreeing with Seneca's appraiser's conclusions, and setting the real market value of Seneca's cogeneration facility at $38.2 million as of January 1, 2012, and $19.1 million as of January 1, 2013. Seneca Sustainable Energy, LLC v. Dept. of Rev. , 22 OTR 263, 2016 WL 5395926 (2016).
The department appeals the Tax Court's determination of the real market value of Seneca's cogeneration facility. The department makes both a procedural and a substantive argument. The department contends *365 that the Tax Court erred in failing to grant its motion to dismiss Seneca's complaint, and on the merits, it argues that the Tax Court erred in determining the real market value of Seneca's industrial property without reference to the terms of Seneca's power purchase agreement with EWEB. We address the procedural arguments first. **790 THE DEPARTMENT'S PROCEDURAL ARGUMENTS
In contending that the Tax Court erred in denying its motion to dismiss, the department makes two arguments: First, the department argues that the Tax Court did not have jurisdiction over Seneca's complaint, because Seneca's claims do not arise out of the tax laws of this state.[10] Second, the department argues that Seneca did not have standing to bring the two complaints, because it was not a "taxpayer" insofar as its property was tax exempt, and because it was not "aggrieved" by an act of the department in its administration of the tax laws of the state. To the extent that those issues involve overlapping considerations, we address them together.
As relevant here, in its complaint concerning the 2012-2103 tax year, Seneca requested that the Tax Court:
"(1) [Determine that the] real market value of the subject property does not exceed $30,000,000 for the 2012-2013 tax year;
"[and]
"(2) Order defendants to place the appropriate real market value and tax exempt value for the subject property upon the 2012-2013 tax rolls[.]"
**791 The consolidated complaint pertaining to the 2013-14 tax year contains parallel requests for relief.[11]
The first claim for relief is a request for a determination of the real market value of Seneca's industrial property, and, as such, it falls squarely within the statute governing appeals pertaining to the assessed value of industrial properties, ORS 305.403. That statute provides, in pertinent part:
"(1) An appeal by a taxpayer dissatisfied with the assessed value or specially assessed value of land or improvements of a state-appraised industrial property must be brought in the tax court.
"(2) An appeal under this section is taken by filing a complaint with the tax court in the manner prescribed under ORS 305.560 [setting out steps for filing and service of Tax Court complaints] during the period following the date the tax statements are mailed for the current tax year and ending December 31."
We note that ORS 305.403(1) requires a taxpayer who is dissatisfied with the assessed value of industrial property to bring an appeal in the Tax Court. However, determination of assessed value is predicated in part on *366 a determination of real market value. ORS 308.146(2) (assessed value equals the lesser of the property's maximum assessed value or the property's real market value). Therefore, a challenge to a determination of real market value also falls under ORS 305.403(1). Additionally, the second claim for relief is derived from the first, insofar as it requests an order directing that the tax rolls properly reflect the correct real market values as the statutes require, and therefore also falls under ORS 305.403(1).
In addition, both claims for relief fall within the jurisdictional grant in ORS 305.410(1), which makes the Tax Court, subject to certain exceptions not applicable here, **792 "the sole, exclusive and final judicial authority for the hearing and determination of all questions of law and fact arising under the tax laws of this state."[12] Generally speaking, a claim arises "under the tax laws of this state" if "it has some bearing on tax liability." Sanok v. Grimes , 294 Or. 684, 701, 662 P.2d 693, 703 (1983). Here, all the statutes related to Seneca's claims bear on tax liability. The first claim arises out of the department's obligation to determine real market value for industrial properties. ORS 306.126 (requiring department to determine the real market value of industrial property and to advise the county assessor of that value). The second claim arises out of the assessor's obligation to ensure that the tax rolls correctly reflect assessed values. ORS 305.440(2) (directing correction of assessment and tax rolls upon the final determination of any ad valorem tax matter); ORS 311.205 (authorizing correction of errors on the assessment and tax rolls). Moreover, the Lane County tax assessor entered the department's valuation of Seneca's industrial property on the assessment roll, along with a notation that Seneca would be "subject to potential additional penalties" if it lost its tax exemption, as required by ORS 285C.175(7)(a) and (c). Thus, both claims "arise[ ] out of the tax laws of this state."
The department objects that the Tax Court does not have jurisdiction under either ORS 305.403 or ORS 305.410, because those statutes apply only to appeals by taxpayers . According to the department, Seneca was not a "taxpayer" with respect to the cogeneration facility, because that property was exempt from taxation during the years at issue. That objection need not detain us long. It is undisputed that Seneca owns the parcel of land on which the cogeneration facility sits, as well as the improvements to that property-the structures, machinery, and equipment that constitute Seneca's industrial property. Under ORS 307.030, all of that property is taxable. That statute provides:
**793 "All real property within this state and all tangible personal property situated within this state, except as otherwise provided by law, shall be subject to assessment and taxation in equal and ratable proportion."[13]
At all times material to this case, Seneca, as noted, has been paying property taxes on the real property underlying the cogeneration facility. Under ORS 307.030, Seneca also is subject to taxation on the improvements to that property. Although Seneca was exempt from taxation on some of the improvements to its property during the period of the enterprise zone exemption,[14] it would again be taxed on its industrial property at the expiration of the exemption period. ORS 285C.175(2). The fact that Seneca's property tax bill was reduced temporarily by operation of the enterprise zone exemption does not alter the conclusion that Seneca was a taxpayer for purposes of the tax laws of this state.
*367 That conclusion is consistent with the use of the term "taxpayer" throughout the tax laws of this state to refer to a person who is subject to potential taxation, whether or not that person owes taxes in a given year. To take just a few examples, a tax credit is allowed against taxes otherwise due for a "taxpayer" that is a corporation or other eligible business in a reservation enterprise zone, even though such credits may offset the entire tax owed. ORS 315.506(1) - (3). Similarly, ORS 291.349(5)(f), which deals with "disposition of revenue in excess of estimate," or Oregon's "kicker" tax rebate system, also contemplates that a "taxpayer" may not pay taxes in a given year. That statute provides for a tax refund rather than a tax credit "for personal income taxpayers" if the kicker "reduces tax liability to zero." Likewise, ORS 307.145 provides that a child care facility run by a charitable or religious institution that is exempt from taxation must submit a statement to the department that is "signed by the taxpayer." ORS 307.145(3)(b)(C). And **794 ORS 317.124(2), dealing with excise tax credits for certain corporations, refers to "a taxpayer that owns a facility that is exempt from property tax." In each of those instances, the legislature used the word "taxpayer" to refer to an individual or entity that might be subject to taxation, irrespective of whether that person or entity actually would owe taxes in a given year.
Based on the foregoing, we hold that Seneca was a taxpayer for purposes of ORS 305.403 and ORS 305.410 for tax years 2012-13 and 2013-14, notwithstanding that it was exempt from taxation on part of its property during that period. And because Seneca's challenge to the department's determination of the real market value of its industrial property arises out of the tax laws of this state, we also hold that the Tax Court had jurisdiction over Seneca's complaints.
The department also contends that Seneca does not have standing under ORS 305.275 to bring its complaints before the Tax Court. That statute provides that, to appeal to the Tax Court, "[t]he person must be aggrieved and affected by an act, omission order or determination of" the tax authorities of a county or the state.[15] According to the department, Seneca was not "aggrieved and affected" by **795 the department's determination of its property's real market value, because Seneca's property is tax exempt. Rather, the department argues, Seneca was "aggrieved," if at all, by the zone sponsor's calculation of the public benefit contribution, which did not involve the administration of the revenue and tax laws of this state.
In response, Seneca argues that it had standing to bring its complaints under ORS 305.403, which, as we have discussed, governs appeals of determinations of assessed value of industrial property, and that that statute does not require it to establish that is was aggrieved by the actions of a taxing authority. Rather, Seneca contends, ORS 305.403 has only two conditions for standing, both of which it met: it is a "taxpayer" whose principal industrial property was valued by the department, and it was "dissatisfied with the assessed value."
At oral argument, the department disagreed with Seneca's interpretation of ORS 305.403. It pointed to ORS 305.403(2), which *368 provides that an appeal of an assessed value determination "is taken by filing a complaint with the tax court in the manner prescribed under ORS 305.560." ORS 305.560, in turn, requires a showing that the complainant is aggrieved:
"The complaint shall state the nature of the plaintiff's interest, the facts showing how the plaintiff is aggrieved and directly affected by the order, act, omission or determination and the grounds upon which the plaintiff contends the order, act, omission or determination should be reversed or modified."
ORS 305.560(2).
We need not decide today whether ORS 305.403 contains an aggrievement requirement, however, because, as we shall explain, we conclude that Seneca had standing to bring these claims in either case.
We begin by pointing out that both ORS 305.275 (1)(a) and ORS 305.560 require more than a showing that the taxpayer is "aggrieved." ORS 305.275(1)(a) requires that a "person must be aggrieved by and affected by" the challenged act or order, and ORS 305.560 requires a showing **796 that a "plaintiff is aggrieved and directly affected by" the challenged act or order. In addition, ORS 305.275(1)(b) requires that the challenged act "must affect the property of the person making the appeal." Both parties focus on the aggrievement requirement; neither addresses the additional requirement that the person or property be "affected" or "directly affected." For the reasons that follow, we conclude that Seneca was aggrieved by the department's erroneous real market value determination and that that act directly affected Seneca and its property.
The term "aggrieved" is not defined in the tax statutes. The dictionary defines "aggrieve," as pertinent here, as follows:
"to inflict injury upon : OPPRESS, WRONG < provision should be made for recourse to the courts for parties who may be aggrieved by such orders * * *>."
Webster's Third New Int'l Dictionary 41 (unabridged ed. 2002) (emphasis in original). In NW Medical Lab. v. Good Samaritan Hospital , 309 Or. 262, 786 P.2d 718 (1990), this court fleshed out that basic definition, stating that, as the term is used in ORS 305.275(1), to prove aggrievement, a person must show more than simply that he or she, in common with others, suffered some injury by the order, act, omission, or determination of the department or county official or tax collector:
"[t]o be 'aggrieved' is to be something more than just dissatisfied with the result. It is to have an interest in the outcome-an interest beyond that shared with the general public-such as pecuniary or other interest peculiar to the person who claims to be aggrieved."
309 Or. at 268, 786 P.2d 718. That is, all that is required to prove aggrievement under ORS 305.275(1) is a showing that the person suffered an injury or wrong that creates a private interest in the outcome of the matter that is different from that of a member of the general public. Seneca has shown such an interest. Seneca alleged that the department miscalculated the real market value of its industrial property and that the enterprise zone sponsors used the department's erroneous real market value determination and the county's notation of that value on the assessment roll to impose a **797 significant public benefit contribution on Seneca for each of the tax years in question. Seneca thus alleged a wrong-the erroneous real market value determination-and a private interest that is different from that of the general public-the imposition of an excessive public benefit contribution directly resulting from that erroneous determination. Seneca, thus, was 'aggrieved' by the department's real market value determination under ORS 305.275(1). Neither party has suggested that a different standard for aggrievement applies to ORS 305.560.
Seneca and its property also were "affected by" the department's erroneous real market value determination. This court suggested in NW Medical Lab. that pecuniary harm other than an increase in taxes resulting from the act of the taxing authority may be sufficient to show that the person or property was "affected by" that act. In that case, property belonging to the plaintiff, a for-profit business, was subjected to taxation, but its non-profit competitors' properties *369 were tax-exempt. The plaintiff sought a writ of mandamus in the Tax Court, ordering the assessor to include the competitors' properties on the tax rolls, and the Tax Court issued a writ directing the assessor to make a determination as to whether the properties should be included. The assessor concluded that the competitors' properties were exempt and declined to add them to the tax rolls. The plaintiff appealed the assessor's decision to the Department of Revenue, which dismissed the appeal because it had concluded that the plaintiff lacked standing.
On review, this court held that the plaintiff was "aggrieved," even though it did not own the property subject to the challenged order, because it was among those expressly recognized by the legislature as entitled to bring a mandamus proceeding under former ORS 311.215, now ORS 311.232, and it was denied the relief that it had sought. 309 Or. at 268-69, 786 P.2d 718. Importantly, with respect to whether the department's action in denying the plaintiff mandamus relief "affected" the plaintiff's property, the court stated,
"Arguably, the plaintiff can establish that its property has been affected by the assessor's decision because the plaintiff owns property located in the same county as defendants'
**798 property, because the plaintiff's property is devoted to the same use as the property of the defendants that the assessor exempted from taxation, and because the plaintiff and the defendants directly compete against each other for the same business ***. Its cost of doing business is greater than that of its competitor as a result of the assessor's determination, and the plaintiff arguably has standing because of that fact."
Id . at 269, 786 P.2d 718. Ultimately, the court in NW Medical Lab. declined to rely on the financial harm to the plaintiff resulting from the denial of mandamus relief in determining standing. Instead, it concluded that the department's order affected the property for the same reasons that the plaintiff in that case was aggrieved.
Here, the harm flowing to Seneca from the department's real market value determination more clearly affected Seneca and its property. Seneca is the taxpayer whose property is involved, and it was required to pay an inflated public benefit contribution as a direct result of the department's erroneous determination of the real market value of its industrial property. However, as in NW Medical Lab. , we need not rely on that showing of financial harm to Seneca to conclude that Seneca and its property were affected by the department's real market value determination. That is so, because the county imposed property taxes on Seneca for the tax years in question based on the department's real market value determination. As we have stated, not all of Seneca's industrial property was exempt from taxation in tax years 2012-13 and 2013-14. In tax year 2012-13, the county determined that industrial property with a real market value of $217,722 was not exempt from taxation and imposed property taxes in the amount of $2,247.18 on that property. For tax year 2013-14, the county determined that industrial property with a real market value of $5,160,501 was not exempt from taxation and imposed property taxes in the amount of $55,600.66 on that property. Seneca's property tax bills in both years were improperly inflated if the department's real market value determination was erroneous.
For those reasons, we conclude that Seneca was "aggrieved and affected" by the department's real market **799 value, and it had standing to challenge that determination under ORS 305.403 and ORS 305.410.
THE DEPARTMENT'S ARGUMENTS ON THE MERITS
We turn to the department's argument that the Tax Court erred in rejecting its appraiser's determination of the real market values of Seneca's industrial property for the 2012 tax year. The phrase "real market value" is defined for purposes of the tax statutes as follows:
"Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."
*370 ORS 308.205(1). Under that definition, the determination of real market value is focused on the sale price of the property in an arms-length transaction on the assessment date. Ellison v. Dept. of Rev. , 362 Or. 148, 152, 404 P.3d 933 (2017). Appraisers use three approaches in determining the real market value of industrial property: the cost approach, the income approach, and the comparable sales approach. OAR 150-308-0260. As this court explained in Ellison ,
"[t]he approaches are named for the types of indicators that the appraiser uses to estimate the value that a purchaser in the market would pay for the property. The cost approach considers the cost of constructing a substitute property that provides the same utility as the subject property at its highest and best use; the income approach relies on the income stream that the property generates; and the comparable sales approach examines the prices that buyers have paid for similar properties."
362 Or. at 152, 404 P.3d 933 (internal quotation marks omitted). Under OAR 150-308-0260(3)(a), appraisers must use all three approaches when determining real market value of industrial property. However, that rule recognizes that some approaches cannot be applied to a particular property. Id . In this case, the parties and the Tax Court agreed that the most appropriate way to determine the real market value of Seneca's cogeneration facility was to use the income **800 approach. As this court stated in Burlington Northern, Inc. v. Dept. of Rev. , 291 Or. 729, 737, 635 P.2d 347 (1981),
"[t]he Income approach to the valuation of property is a method of estimating the present worth of the benefits to be derived from the property in the future. The method involves a determination of the present and prospective income from the property, reduced to an indication of value by a mathematical process known as 'capitalization.' A rate known as the 'capitalization rate' is applied to the estimated net annual income produced by the property to determine its value."
As noted above, the department's appraiser determined that the real market value of Seneca's industrial property, using the income approach, was $59.9 million. The department's appraiser based his determination of real market value on his understanding that the rates set out in Seneca's power purchase agreement with EWEB were rates that a purchaser of the facility could expect to receive for electricity, capacity, and RECs during the tax years at issue and on into the future. Building upon that premise, the department's appraiser used the rates that EWEB was obligated to pay Seneca under the power purchase agreement to project future income for the cogeneration facility.
Seneca, by contrast, presented evidence that, as of the assessment dates, the power purchase agreement resulted in revenues significantly above what a purchaser of the property on the assessment dates could have obtained. Specifically, Seneca's witnesses demonstrated that the price that a purchaser would have been willing to pay for electricity on January 1, 2012, and January 1, 2013, was significantly depressed as a result of natural gas prices plummeting in the period after Seneca entered into the power purchase agreement with EWEB. Additionally, Seneca's witnesses presented evidence that, although the power purchase agreement included substantial payments for capacity, it is unusual in the Northwest for utilities buying from cogeneration facilities to pay for capacity due to the constant availability of hydroelectric power. For that reason, Seneca's witnesses reasoned, such payments would not have been available to a purchaser of the biomass facility on the assessment dates. Similarly, Seneca's witnesses demonstrated that **801 a purchaser of the biomass facility could have expected little, if any, revenue from RECs on the assessment dates, because the biggest market for RECs-California-had essentially become closed to Oregon renewable energy generators after a change in California law.
Based on changes in the market after the power purchase agreement was executed, the Tax Court found, for reasons discussed more fully later in this opinion, that Seneca had been "extremely fortunate" to negotiate the terms that it had, Seneca , 22 OTR at 270, and that the rates in the power purchase *371 agreement were not available as of the assessment dates and would not be available in the future. Id . at 266. In its findings of fact, the Tax Court found that, while Seneca's witnesses had extensive experience in and knowledge of the power markets in the Pacific Northwest, the department's appraiser was not as familiar with those markets, and his understanding that the power purchase agreement reflected then-current market rates for the sale of electricity, capacity, and RECs was fundamentally incorrect. Id . at 266, 273. The Tax Court found, on the factual question of whether the power purchase agreement reflected market rates on the assessment dates, that the evidence that Seneca had presented "far outweigh[ed] in persuasiveness" the evidence that the department had presented. Id . at 266. Ultimately, the Tax Court found, as a matter of fact, that,
"as of the assessment dates, the [power purchase agreement] brought to [Seneca] revenues significantly in excess of what a purchaser of the property on those dates would have been able to negotiate for, either in the spot market or pursuant to a contract entered into as of the assessment dates."
Id.
Turning to analyze the relative merits of the appraisals, the Tax Court first considered the department's appraisal. The Tax Court found that the department's appraisal contained two "extremely significant errors" and, for that reason, it ruled that the department's appraiser's conclusions were "completely without persuasive value." Id . at 269.
**802 The department's appraiser's first error, the Tax Court stated, was in concluding that a purchaser of Seneca's property on the assessment date would have been able to sell energy, capacity, and RECs at the rates included in the power purchase agreement. Id . at 269-70. As the court had already found, those rates would not have been available as of the assessment dates or in the future. And, because the rates that EWEB had contracted to pay Seneca for electricity under the power purchase agreement were significantly above the market rates on January 1, 2012, and on January 1, 2013, the existence of the power purchase agreement had to be ignored in calculating real market value. Id . at 270. The Tax Court explained that, because the power purchase agreement produced premium returns to Seneca, it was an "intangible" that, under ORS 307.030, was not subject to tax. Id . ; ORS 307.030(2) ("Except as provided in [a part of the statutes not relevant here], intangible personal property is not subject to assessment and taxation.").[16] As the Tax Court stated,
"[t]o the extent that any such intangible produces returns in excess of those obtainable in the market for electricity, capacity, and RECs as of the assessment dates, any value attributable to that premium cannot be taken into account."
Seneca , 22 OTR at 270.
The Tax Court observed that the department's appraiser also revealed that he had erroneously considered intangible assets in determining real market value when he admitted that he had valued Seneca's entire property and business under the income approach, subtracting only an amount for working capital. Id . at 271. In so doing, the court stated, the department's appraiser subjected to assessment Seneca's good will and going concern value, which are intangibles, in contravention of ORS 307.030. Id . ; Deschutes County Assessor v. Broken Top Club, LLC , 15 OTR 231, 237, 2000 WL 1612388 (2000) (Oregon property tax statutes generally do not tax business or going concern value); Boise Cascade Corp. v. Dept. of Rev. , 12 OTR 263, 268, 1991 WL 434542 (1991) (good will and going concern value not taxable in Oregon).
**803 The second "extremely significant error" that the tax court identified in the department's appraisal dealt with its determination of the appropriate capitalization rate-the rate of return based on the income that the property was expected to generate-to be used in the income approach to valuation. The Tax Court found that the department's *372 appraiser departed from accepted financial and appraisal principles in determining the capitalization rate. Seneca , 22 OTR at 271. And, the court stated, the appraiser admitted that he had had no financial or appraisal authority for the method that he had used in developing the capitalization rate. Id . at 272. Therefore, the Tax Court concluded, the department's appraiser "adopted a fundamentally incorrect approach to determination of a capitalization rate," which "render[ed] his conclusions completely without persuasive value."[17] Id . at 273.
By contrast, the Tax Court found that Seneca's appraiser approached the valuation of its industrial property under the income approach the correct way, projecting income based on evidence of the rates that would have been available to a purchaser of the property without regard to any premium rates or other terms in the power purchase agreement. Id . at 270. The court also found that the department's appraiser had used accepted financial and appraisal methods in developing a capitalization rate, and, therefore, it found Seneca's determination as to the capitalization rate to be more persuasive. Id . at 273. In the end, while acknowledging that Seneca's appraisal was not entirely free from weaknesses, the Tax Court concluded that the value arrived at by Seneca's appraiser was the more persuasive of the two presented to the court. Id . For that reason, the court found that Seneca's real market value determination, using the income approach, was "more probably than not, the proper conclusion of value for the valuation dates." Id .
The department challenges the Tax Court's conclusion that its appraiser erred in considering the terms of the power purchase agreement in determining the real market value of Seneca's industrial property. The scope of our review **804 of the Tax Court's decision is statutory. We review the Tax Court's legal determinations for errors of law, and we review its factual findings for lack of substantial evidence in the record. ORS 305.445 ("The scope of the review of either a decision or order of the tax court judge shall be limited to errors or questions of law or lack of substantial evidence in the record to support the tax court's decision or order.").
The department argues that the Tax Court erred in refusing to consider the rates included in Seneca's power purchase agreement with EWEB as evidence of the market price of electricity, and that that error caused the Tax Court to undervalue Seneca's industrial property. The department makes two arguments to support its contention that the Tax Court erred, but neither is persuasive.
First, the department reasons that the income approach to appraisal "involves a determination of the present and prospective income from the property," Burlington Northern , 291 Or. at 737, 635 P.2d 347, and that past earnings performance is "the primary factual basis of a reasoned prediction of future income." Mt. Bachelor v. Dept. of Rev. , 273 Or. 86, 92, 539 P.2d 653 (1975). The department then asserts that the power purchase agreement was relevant evidence of Seneca's past earnings performance, because Seneca's cogeneration facility sold all of its electricity under that agreement. It also contends that the Tax Court disregarded the income that Seneca's property produced under the power purchase agreement, merely because it "is contained in a contract." The department acknowledges that, under ORS 307.030(2) and ORS 307.020(1)(a)(F), contracts are intangible personal property and not subject to assessment and taxation, but it asserts that that statute does not preclude consideration of the power purchase agreement in this case. In support of that position, the department attempts to draw a distinction between taxation of the power purchase agreement itself, which it concedes is impermissible, and "consideration of the existence of the agreement in determining the income Seneca's cogeneration facility may reasonably be expected to produce," which, according to the department, would support a higher real market valuation. (Emphasis in original.)
**805 There are several problems with those arguments. First, the Tax Court did not conclude *373 that the power purchase agreement must be ignored merely because it is a contract, but because it is a contract that produces premium returns. As the Tax Court stated, the value of intangible contract rights cannot be taken into account "[t]o the extent that [they] produce[ ] returns in excess of those obtainable in the market for electricity, capacity, and RECs as of the assessment dates." Seneca , 22 OTR at 270. Second, it is not clear to us that there is a legitimate distinction to be drawn between taxing a contract itself and taxing, essentially, the effect of a contract on revenue, when the revenue earned is dependent on and determined by terms unique to that contract. And third, to the extent that the department is arguing that the existence of the agreement is relevant evidence of market rates for power, capacity, and RECs, that argument is at odds with the Tax Court's factual finding, which was supported by substantial evidence in the record, that the power purchase agreement provided Seneca with revenues significantly in excess of what a purchaser of the property on the assessment dates would have been able to negotiate for, for electricity, capacity, and RECs. Because the rates set out in the power purchase agreement are significantly above the market rates, the power purchase agreement simply does not reflect "the income Seneca's cogeneration facility may reasonably be expected to produce" on the assessment date and thereafter.
Notably, at trial, the department's appraiser seemed to agree that the power purchase agreement would be relevant in determining real market value under the income approach only if it reflected market rates for power. During cross-examination, the department's appraiser agreed that power purchase agreements that "do not meet the criteria for a market indicative transaction * * * cannot be used to determine market value for parts of the plant such as the real estate or personal property." Along the same lines, the department's appraiser also testified that the present situation was analogous to appraising an office building's real market value based on leases that are not at market rates. The department's appraiser stated that an appraisal should **806 not be based on the owner's income stream from leases in the office building that are above or below market, because, in that case, the appraisal would be of the lease and not the fee simple. Finally, the department's appraiser acknowledged that he relied on certain terms in the power purchase agreement in determining the real market value of Seneca's cogeneration facility under the income approach, because he believed that they reflected market rates , and he stated that, if he had determined that the power purchase agreement was substantially above market, he would have discounted the contract. Thus, the department's appraiser's own testimony suggests that his appraisal was inflated because of his erroneous belief that the power purchase agreement reflected market rates.
Second, the department argues that, by failing to consider the power purchase agreement, the Tax Court valued Seneca's cogeneration facility at less than its "highest and best use." According to the department, the income approach to valuation "relies on the profits that the property can generate at its highest and best use." Hewlett-Packard Co. v. Benton County Assessor , 357 Or. 598, 603, 356 P.3d 70 (2015). Therefore, the department urges, the Tax Court should have considered the power purchase agreement as evidence of the revenue that Seneca was producing at the assessment dates and would generate into the future, at its highest and best use. In other words, the department seems to suggest that the "highest and best use" of a property refers to the maximum revenue that could be earned under a particular contract. The department misunderstands the import of the phrase "highest and best use."
As this court explained in Hewlett-Packard , the department's rule relating to industrial property valuation requires appraisers to value property at its "highest and best use." OAR 150-308-0260(3)(i) ("Determining the highest and best use for the unit of property is necessary for establishing real market value."). The rule defines the phrase as follows:
" 'Highest and best use' means the reasonably probable use of vacant land or an improved property that is legally permissible, *374 physically possible, financially feasible, and **807 maximally productive, which results in the highest real market value."
OAR 150-308-0260(1)(c). The department requires a property to be valued at its highest and best use, because a seller " 'can expect to receive the highest offer from a prospective buyer who intends to put the property to its most profitable use.' " Hewlett-Packard , 357 Or. at 602, 356 P.3d 70 (quoting STC Submarine, Inc. v. Dept. of Rev. , 320 Or. 589, 592 n 5, 890 P.2d 1370 (1995).
The revenue that might be earned under a particular contract may play into the determination of which use of the property is the most profitable, insofar as one use may produce limited revenues while another use of similar property may produce much higher revenue, as evidenced by the terms of a particular contract, or have a higher real market value, as evidenced by higher sale prices.[18] However, the focus of the rule is on which "use" of the property is "the most profitable" and, therefore, is the use that "results in the highest real market value." The parties and the Tax Court agree in this case that the highest and best use of Seneca's industrial property is as a biomass cogeneration facility.
**808 The existence of Seneca's power purchase agreement with EWEB does not factor into that determination.[19]
To summarize, many of the department's arguments in this case are predicated on its contention that its appraiser correctly determined that Seneca's power purchase agreement with EWEB reflected market rates on January 1, 2012. The Tax Court found that that predicate is incorrect and that that error *375 seriously undermines the department's appraiser's determination of the real market value of Seneca's industrial property on the assessment date. The Tax Court also concluded that the department's appraiser made two other significant errors-in valuing Seneca's cogeneration facility as a going concern and in adopting a fundamentally incorrect approach to determination of the capitalization rate-and the department does not challenge those rulings in this court. Those errors led the Tax Court to rule that the department's appraiser's conclusions were "completely without persuasive value." We therefore affirm the Tax Court's real market value determination for Seneca's cogeneration facility for tax year 2012-13. **809 As we have noted, the department did not submit an appraisal of Seneca's industrial property for tax year 2013-14. We therefore also affirm the Tax Court's real market value determination for Seneca's cogeneration facility for tax year 2013-14.
The judgment of the Tax Court is affirmed.

The existence of the power purchase agreement made it possible for Seneca to obtain debt financing of a part of the cost of the property.

"Capacity" refers to the assurance that the seller will deliver certain quantities of energy at certain peak need times. Renewable energy credits (RECs) are tradable commodities; each REC represents one megawatt hour of energy that is generated from a renewable energy source and delivered to the electricity grid. RECs were devised to permit compliance with applicable state renewable energy standards for utilities operating in particular jurisdictions. Those standards require utilities to ensure that a part of their sales come from renewable energy sources, including wind, wave, small hydroelectric, and biomass. A utility can satisfy those standards in two ways: It can purchase renewable energy produced by a renewable energy generator such as Seneca, or it can purchase RECs, which it can hold for later use. A utility can satisfy renewable energy standards by "spending" a previously purchased REC; the utility will be considered to have acquired the energy from renewable resources when it spends the REC.

Under the Oregon Enterprise Zone Act, certain areas in Oregon were designated "enterprise zones" to receive government attention "to help attract private business investment into these areas and to help resident businesses to reinvest and grow *** by providing tax incentives for employment, business, industry and commerce[.]" ORS 285C.055.

In 2015, the legislature amended several statutes related to the department's responsibility to determine the real market value and assessed values of industrial properties and the appeal of such valuations. Among other things, the amendments change the definition of Seneca's property from "principal industrial property" to "state-appraised industrial property" but otherwise are not relevant to the issues raised in this appeal. We therefore refer in this opinion to the current version of all cited statutes.

That figure is the sum of the valuations of three separate tax accounts for Seneca's machinery and equipment, buildings, and structures. The value of the land underlying the facility is not part of the "industrial property" and, therefore, it is not included in the enterprise zone exemption (ORS 285C.180(1) ; ORS 285C.180(3) ), and it is not exempt from taxation. Seneca paid property taxes on the real market value of the land underlying its cogeneration facility in both the 2012-13 and 2013-14 tax years.

ORS 285C.175(7) provides:
"For each tax year that the property is exempt from taxation, the assessor shall:
"(a) Enter on the assessment roll, as a notation, the assessed value of the property as if it were not exempt under this section.
"(b) Enter on the assessment roll, as a notation, the amount of additional taxes that would be due if the property were not exempt.
"(c) Indicate on the assessment roll that the property is exempt and is subject to potential additional taxes as provided in ORS 285C.240, by adding the notation 'enterprise zone exemption (potential additional tax).' "

Seneca's complaint requests the court to order the department "to place the appropriate real market value and tax exempt value for the subject property upon the 2012-13 tax rolls ." (Emphasis added.) The complaint that Seneca later filed challenging the department's 2013-14 real market value determination similarly refers to "tax rolls." Seneca appears to be using the term "tax rolls" as a shorthand reference to both the assessment roll and the tax roll. As we have explained, under ORS 285C.175(7), the assessor makes a notation of the real market value on the "assessment roll." Under ORS 311.115, the assessor is required to deliver the assessment roll to the tax collector, at which point it becomes the "tax roll." See State ex rel. Medf. Pear Co. v. Fowler , 207 Or. 182, 191, 295 P.2d 167 (1956) (explaining how assessment roll becomes tax roll). Neither the department nor the Tax Court has objected to Seneca's usage of the term "tax rolls" as imprecise or misleading. Because Seneca has effectively challenged the placement of an allegedly excessive real market value on both the assessment roll and the tax roll, we also use "tax rolls" to refer generally to both the assessment roll and the tax roll unless the context requires greater specificity.

In a separate order, the Tax Court also ordered that the City of Eugene be dropped from the case as a defendant. Seneca does not challenge the Tax Court's rulings respecting its jurisdiction over the public benefit contribution issue or the city's participation in the case.

The department does not challenge that ruling.

The department's overarching contention regarding jurisdiction is that all the claims for relief in Seneca's two complaints were, in actuality, challenges to the validity of a public benefit contribution imposed under ORS 285C.150, insofar as all of Seneca's claims arose out of Seneca's objection to the enterprise zone sponsors' imposition of public benefit contributions in 2012 and 2013. The department argues that there are no explicit grants of jurisdiction to the Tax Court over such matters in the enterprise zone statutes, and, therefore, the Tax Court does not have jurisdiction over Seneca's complaints. In apparent recognition of the fact that the Tax Court had dismissed the only claims for relief in Seneca's first complaint that dealt with the public benefit contribution and that the second complaint did not reference the public benefit contribution at all, the department asserts that the Tax Court erred "in concluding that Seneca's other claims for relief challenging the department's determination of the real market value of the property were severable from its challenge to the [public benefit contribution] calculation." (Emphasis in original.) The department does not support its assertion regarding the nonseverability of the claims with either argument or citation to authority. Because both of Seneca's complaints expressly challenge the department's determination of real market value and the notation of that value on the assessment and tax rolls, we consider the Tax Court's jurisdiction to hear those claims.

The complaint pertaining to the 2013-14 tax year requested that
"the court determine that the real market value of the subject property does not exceed $31,000,000, and order defendants to place the appropriate assessed value upon the 2013-2014 tax rolls; order any tax refund to be promptly paid with statutory interest to plaintiff; and award plaintiff its costs, disbursements and any applicable attorneys' and experts' fees."

ORS 305.410 provides:
"(1) Subject only to the provisions of ORS 305.445 relating to judicial review by the Supreme Court and to subsection (2) of this section [providing for concurrent jurisdiction with the circuit court in certain circumstances], the tax court shall be the sole, exclusive and final judicial authority for the hearing and determination of all questions of law and fact arising under the tax laws of this state. ***"

Under ORS 307.020(1)(c), "tangible personal property"
"includes but is not limited to all chattels and movables, such as boats and vessels, merchandise and stock in trade, furniture and personal effects, goods, livestock, vehicles, farming implements, movable machinery, movable tools and movable equipment."

As noted, Seneca was assessed property taxes on its nonexempt industrial property.

ORS 305.275 provides, in part:
"(1) Any person may appeal under this subsection to the magistrate division of the Oregon Tax Court as provided in ORS 305.280 and 305.560, if all of the following criteria are met:
"(a) The person must be aggrieved by and affected by an act, omission, order or determination of:
"(A) The Department of Revenue in its administration of the revenue and tax laws of this state;
"(B) A county board of property tax appeals other than an order of the board;
"(C) A county assessor or other county official, including but not limited to the denial of a claim for exemption, the denial of special assessment under a special assessment statute, or the denial of a claim for cancellation of assessment; or
"(D) A tax collector.
"(b) The act, omission, order or determination must affect the property of the person making the appeal or property for which the person making the appeal holds an interest that obligates the person to pay taxes imposed on the property. As used in this paragraph, an interest that obligates the person to pay taxes includes a contract, lease or other intervening instrumentality.
"(c) There is no other statutory right of appeal for the grievance."

"Intangible personal property" is defined to include, among other things, "contract and contract rights." ORS 307.020(1)(a)(F).

The department does not challenge the Tax Court's conclusion that its appraiser's approach to determining the capitalization rate was incorrect.

That concept is illuminated in Swan Lake Mldg. Co. v. Dept. of Rev. , 257 Or. 622, 478 P.2d 393 (1970). In that case, the dispute was over the assessment of real property, on which various commercial and industrial buildings were located, including a shopping center that the Tax Court described as "one of the busiest and most attractive areas in southern Oregon." Id . at 623, 478 P.2d 393. The assessor based his valuation of the property on a comparable sales approach, based on prices that buyers had paid for similar properties and relying primarily on the parcels purchased for the shopping center on the subject property. The taxpayer in that case argued that an income approach was more realistic and that the assessor had improperly failed to consider the long-term leases for older industrial businesses on the property, which encumbered substantial parts of the property and which had a significant, adverse effect on the revenue produced by the property.
The court stated that the assessor was correct to disregard the effect of existing leases on the value to the owner when determining the real market value of land for property tax purposes, because, although only the property owner pays the tax, the tax is upon all the interests in the land, including the leasehold interests. Id . at 625, 478 P.2d 393. As relevant here, however, the court also held that the taxpayer had not rebutted the assessor's conclusion that the nature and location of the property justified the assumption that businesses would be willing to pay higher prices for the property. Id . at 627-28, 478 P.2d 393. In other words, the highest and best use of the property was the shopping center, and not the leasing of old industrial buildings, and, therefore, the assessor's determination of the real market value of the property appropriately reflected that fact.

The department also argues that the Tax Court's decision to disregard the power purchase agreement caused it to conclude, erroneously, that it was required to determine the real market value as of the assessment dates. The department contends that evidence of electricity prices from the agreement, which preceded the assessment dates, was pertinent to the analysis, because agreements like the power purchase agreement can take up to 18 months to negotiate and finalize. In support of that argument, the department relies on Truitt Brothers, Inc. v. Dept. of Rev. , 302 Or. 603, 732 P.2d 497 (1987), in which this court held that a sale of a cannery in Salem 15 months before the assessment of a different cannery in Salem was a "comparable sale" for purposes of establishing the real market value of the subject property. The court held that, because it takes from one to two years to market an industrial facility, a sale of a similar property during that time frame was reasonably relevant under the circumstances. Id . at 609, 732 P.2d 497.
Truitt Bros. is inapposite to this case. For one thing, the appraisers used the income approach rather than the comparable sales approach in determining the real market value of Seneca's cogeneration facility. For another, here, the department was statutorily required to determine the real market value of the property as of the assessment dates, not as of the earlier date when the power purchase agreement, which reflected then-market rates, was negotiated. ORS 308.205 (real market value means the amount a buyer would pay for the property in an arms-length transaction "occurring as of the assessment date for the tax year"). As we have stated, the Tax Court found, as a matter of fact, that the power purchase agreement did not reflect market rates as of the assessment dates. That finding is supported by substantial evidence in the record, and we will not disturb it on review.